# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

DOMINGO RODAS,
Defendant and Appellant.

S237379

Second Appellate District, Division Three
B255598

Los Angeles County Superior Court
BA360125

November 26, 2018

Justice Kruger filed the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Kline concurred.

PEOPLE v. RODAS

S237379


Opinion of the Court by Kruger, J.


Defendant Domingo Rodas was found incompetent to stand trial and ordered confined at a state hospital. After several months of treatment with antipsychotic medication, hospital physicians reported that defendant had regained trial competence, but cautioned that it was important for defendant to continue taking his medication. At the start of his jury trial some months later, however, the trial court learned that defendant had stopped taking his medication and that he had begun communicating incoherently with counsel about defense strategy, exhibiting some of the same symptoms he had displayed during earlier episodes of incompetence. Defense counsel declared a doubt about defendant's competence, but the trial court ruled that the trial could proceed after conducting a brief colloquy with defendant in which defendant was able to identify the charges against him and stated a willingness to go to trial and work with counsel. Later, against counsel's advice, defendant testified in his own defense. The testimony was incoherent and the court struck it as irrelevant. Defendant was ultimately convicted on several counts and sentenced to multiple life terms.

We conclude the trial court erred in failing to suspend the criminal trial and initiate competency proceedings at the time counsel declared a doubt as to her client's competence. As a general rule, once a defendant has been found competent to stand trial, a trial court may rely on that finding absent a

substantial change of circumstances. But when a formerly incompetent defendant has been restored to competence solely or primarily through administration of medication, evidence that the defendant is no longer taking his medication and is again exhibiting signs of incompetence will generally establish such a change in circumstances and will call for additional, formal investigation before trial may proceed. In the face of such evidence, a trial court's failure to suspend proceedings violates the constitutional guarantee of due process in criminal trials. (*People v. Rogers* (2006) 39 Cal.4th 826, 847.)

## I.

Rodas, also known by his birth name, Doudley Brown, was charged with murdering Frederick Lombardo, Keith Fallin and Roger Cota, and attempting to murder Kenneth McFetridge and Ronald Vaughn. The victims were homeless men living on the street in Los Angeles. All of the victims were stabbed over the course of July and August 2009; four of the stabbings occurred within a few hours in the same area of Hollywood. Defendant was apprehended in the area carrying a knife. DNA from three of the victims was found on the knife, its sheath, or defendant's shirt. A surviving victim later identified defendant from a photographic lineup, and one of the fatal stabbings was captured by surveillance cameras.

In February 2012, before trial began, the parties raised the question of whether defendant was competent to stand trial. The parties agreed to submit the question on the reports of two experts, psychiatrist Kory J. Knapke and psychologist Sara Arroyo, without any live testimony or argument. After reviewing the reports, the trial court found defendant incompetent to stand trial.

Only Dr. Knapke's report is in the appellate record. The report begins by recounting defendant's psychiatric history. In 1974, when he was 19 years old and still known as Doudley Brown, defendant was hospitalized in a military hospital for a psychiatric disorder. He received a medical discharge from the United States Army and a 30 percent disability rating for psychiatric reasons. In 1984, he was found incompetent to stand trial and was committed to Patton State Hospital (Patton) for several months. In 1986, defendant returned to Patton when he was found incompetent to stand trial on burglary charges. He was later found competent and was convicted of those charges.

In 1988, at the end of his state prison sentence for burglary, defendant was confined at Atascadero State Hospital (Atascadero) and Patton under a mental health conservatorship.[1] He was diagnosed with schizophrenia, paranoid type, and schizoaffective disorder with substance abuse. At the hospitals, defendant refused to eat or drink, explaining that " 'Lucifer would get him out of the hospital sooner if he starved himself.' " On his admission to Atascadero, he showed symptoms of " 'florid psychosis,' " with marked disorganization to his thinking, and " 'speaking in nonsensical terms or word salad with legalistic flavor.' " For example, he kept repeating the statement, " 'I will have to have my mother review, for I need a legal recourse for my faculties, recourse of legal testament for legal statements of my personage. I don't commit to answer any tests for legal recourse of degree of

---

[1] Under Penal Code section 2974, an inmate who has been released from prison may be placed in a state hospital if a danger to himself, herself, or others, or gravely disabled as a result of a mental disorder, and if he or she does not come within the provisions of the Mentally Disordered Offender Act.

recourse of trial. I did not answer questions. I do not recognize you as being a doctor by personage testimony witness offers.' "

Dr. Knapke's report noted that defendant had been examined by Dr. Arroyo in 2011. According to Knapke, Arroyo found that "defendant's thought processes were fragmented," that he could not rationally cooperate with his attorney, and that he was therefore incompetent to stand trial. Dr. Knapke reached a similar conclusion after examining defendant in January 2012. At the start of the examination, defendant immediately began "rambling in a nonsensical manner" about needing photographs and fingerprints from Patton to prove he had never been there. Dr. Knapke asked about defendant's current charges but defendant did not answer on that subject, instead becoming increasingly agitated. Defendant insisted he was not the person Knapke was talking about and yelled, " 'You're accusing me of being at a hospital.' " When asked whether he believed he suffers from a mental illness, defendant responded, " 'You're basing it on wrong identification. The court should verify that I've never been [at] Patton State Hospital.' "

Dr. Knapke's report summarized defendant's condition succinctly, describing defendant as "psychotic and paranoid . . . and does not make any sense." Because defendant could not rationally cooperate with his attorney or participate in court proceedings, Dr. Knapke concluded, he was incompetent to stand trial. With "zero insight into his mental illness and need for medications," Dr. Knapke wrote, defendant "will require involuntary medications." On a face sheet addendum to his report, Knapke indicated that if untreated with medication, defendant "probably will suffer serious harm to his . . . physical or mental health," but "[p]sychotic medication will likely

restore this person to a state of mental [c]ompetency to stand trial."

Clinical staff at Patton submitted a progress report to the court in May 2012. Staff noted that when defendant was admitted the previous month, he presented with psychotic symptoms including disorganized speech and thought and paranoia. He had been prescribed psychotropic medication to control those symptoms and stabilize his mood. Although he was compliant with the medication regimen, he had not yet been restored to competence.

In a second report, dated October 2012, staff noted that defendant continued to show symptoms of schizophrenia, including "tangential and circumstantial thought processes, and disorganized non-sensical speech." With psychotropic medications, defendant had "demonstrated some symptom stabilization," though not to the point of restored trial competence. Due to his confused thought and speech patterns, defendant was still unable to "logically and meaningfully assist his attorney" or to "appreciate his legal situation in a meaningful way." He showed some progress toward "gaining knowledge of the legal procedures," but while he sometimes began answering a question about court proceedings correctly, he would "become derailed by irrelevant and odd ideas, and ultimately spoil his partially correct response." Clinical staff believed that with continued psychiatric treatment there was a substantial likelihood defendant would achieve trial competence in the foreseeable future, but that without it he was not expected to improve. Staff concluded: "There are no effective alternatives to treatment with antipsychotic medication."

Defendant was transferred from Patton to Atascadero in February 2013.  In May, the Atascadero medical director filed with the court a certification of mental competency under Penal Code section 1372.  The certification was supported by a clinical report dated April 18, 2013.  According to the report, defendant suffered from schizophrenia, but since his transfer he had "presented with organized thought processes and ha[d] not expressed any delusional or paranoid ideation," "appear[ed] to have an adequate factual understanding of his charges and the different court procedures and did not express any delusional thought content about his charges" and was "able to logically discuss his legal options and has the capacity to return to court and cooperate with his attorney."  The report noted, however, that defendant "has limited insight into his history of mental illness and continues to deny he was involved in the charges and insists it was somebody else."  The report cautioned: "He should remain on his current medication regimen once he is returned to custody to prevent mental decompensation and maintain competency related abilities while he waits to return to court."

Further opining on defendant's discharge readiness, the Atascadero report explained that while defendant wished to plead not guilty and go to trial, he understood his plea choices and was willing to listen to his attorney's advice.  In a recommendation for continuing care in defendant's next facility, the report stated: "It is recommended that Mr. Rodas continue to take the medication he is being prescribed to prevent mental decompensation and maintain competency related abilities once he returns to custody and is waiting to return to court."  The Atascadero medical director reiterated this point in a letter to the trial judge accompanying the report and certification: "It is important that the individual remain on this medication for his

own personal benefit and to enable him to be certified under Section 1372 of the Penal Code."

In May 2013, without conducting an evidentiary hearing, the court ruled that defendant was competent to stand trial and reinstituted criminal proceedings. In so ruling, the court stated it was proceeding with no case file before it, only a "docket sheet," and with the understanding that "he was found competent." In later proceedings to settle the record, the superior court judge who presided on that date stated that she had before her only a "dummy file" containing the Atascadero medical director's certification of competence. There being no defense request for a hearing on competence and no objection from either party, the judge explained that she had "inferentially found him competent based upon the doctor's letter."[2] At the hearing, the court and defense counsel discussed the possible need for a court order to ensure defendant received his antipsychotic medication at the jail, but the court made no order at the time or, so far as the record indicates, at a later time.

In March 2014, after jury selection was completed and before opening statements were given, defense attorney Carole Telfer told the court that after recent communications with defendant, she had developed a doubt as to defendant's trial

---

[2] On appeal, defendant contended the trial court could not properly proceed in this manner without a stipulation submitting the matter on the medical report. The Court of Appeal, relying on *People v. Mixon* (1990) 225 Cal.App.3d 1471, 1480, held that absent a request for a hearing, the trial court could summarily approve the state hospital certification of competency. We did not grant review on that issue, and we do not decide it here.

competence. Counsel explained her concerns in an in camera hearing. The previous day, defendant told her he wished to testify on his own behalf, which they had previously agreed he would not do. When she tried to find out what he intended to say in testimony, he sent her a note that said: "Playing record Hollywood department Westside Honor Ranch L.A. County. Two police officers visiting. Four records. Call to testify in court. Statement you are the one that murdered a series of persons in a tunnel." On another page, the note continued (in counsel's reading): "Transcriptures of acquittal of execution, transcriptures of the advance of the court date from May 2nd, 2012 from April 6th, 2012, and transcriptures of the name plake, P-L-A-K-E, Rodas, Domingo to Doudley Brown."

According to counsel, defendant's reference to two police officers visiting him in jail was not accurate. Counsel asked defendant what he meant about "playing record," and from his response she gathered that "he was indicating something about the video, but was asserting that the video they had, all three of them were assimilations and were not the correct video." According to counsel, defendant said that what he had been shown were all "assimilations," though she did not know what he meant by that term. When counsel asked defendant what he meant by "transcriptures of acquittal of execution," he responded in a "word salad"—that is, by "using a lot of polysyllabic words that go around in a circle and don't really make sense."

When counsel tried to talk to defendant about his name change (from Doudley Brown to Domingo Rodas), she reported: "[H]e got very angry at me and again started doing this word salad, talking about—something about forgery and . . . how could they say he was Doudley Brown." Counsel was unsure

8

whether defendant meant that he should be charged with forgery for using the wrong name or that law enforcement authorities were committing forgery by referring to him as Doudley Brown. Counsel was concerned because on previous occasions when defendant had been incompetent to stand trial he had used the same "word salad," though sometimes in the past he had spoken in Spanish instead of English. Defendant had also told defense counsel he was not taking his medication, and unlike earlier interactions since defendant's return to court, counsel was now having difficulty understanding her client: "I don't know what he's saying, I don't know what he wants, and he wants—apparently wants to testify and I'm afraid to put him on the stand because I don't know what's going to come out of his mouth."

After hearing from counsel, the court addressed defendant in the following colloquy:

"The court: . . . Mr. Rodas how you doing?

"The defendant: I'm fine, thank you, your Honor. Since I have returned from Atascadero Hospital, that I've been proved mentally competent to stand trial, it is the first time that I made those notes and I had a conversation with Carole Telfer just yesterday. And I really didn't mean to be obstructive to the person's attention. I didn't know that that was the person means. I was being belligerent as how the—antagonistic as how the person said, and I didn't know that I was being obstructive or confrontive, or con –

"The court: Confrontational.

"The defendant: Yeah, confrontational. And I didn't know that I was being by anyone—being obstructive against the person.

9

"The court: Well, how are you feeling today?

"The defendant: I feel perfectly fine, your Honor. I don't—I don't consider—I only wanted to ask the person's pardon if I possibility was being obstructive that I made up those notes, and I really don't mind how the person to continue defending my case for me and I do mean to keep quiet. I didn't know, at least the first time I spoke to the person admittedly, and I didn't know that I was being—that the person was considering me to be confrontative or obstructive.

"The court: Well, let's slow down here. [¶] You know what we have a jury now?

"The defendant: Yes, your Honor.

"The court: And we're set to start the trial?

"The defendant: Yes, your Honor.

"The court: And do you understand that you've been charged with some serious crimes?

"The defendant: Yes, your Honor.

"The court: You've been—can you tell me what you've been charged with?

"The defendant: Yes, I understood yesterday the proceedings were going over and that I was being charged with three counts of murder and two counts of attempted murder.

"The court: And you know Ms. Telfer is here to defend you on those charges?

"The defendant: Yes, your Honor.

"The court: And are you willing to help her to the best of your ability?

"The defendant: Yes, your Honor."

10

Addressing defense counsel, the court said it was "impressed with his clarity of speech and apparent clarity of reasoning in addressing the court. He understands the charges. He says he's willing to help you." The court then asked defendant if he thought it was "okay to go ahead and have the trial," to which Rodas said, "Yes, your Honor. That will be properly fine, yes, your Honor." The court confirmed that was Rodas's "request." When the court asked Rodas if he was taking his medication, Rodas replied, "No, your Honor, I've been doing without the medication. I've been doing fine. I've been getting along well. I've been there about a year already. I returned from Atascadero Hospital since May of last year and I've been doing fine. I have been doing without my medications. It was just the notes that I made to Ms. Telfer and she thought I was being obstructive or confrontative." Answering the court's leading questions, defendant affirmed he understood what was going on and would try to help his counsel with his defense. The court said, "I think we should go forward." Counsel replied, "Fine. I just wanted to make a record."

The trial proceeded. Against counsel's advice, defendant testified in his own defense. In his testimony, defendant asked the court to "order the three video record exhibition and report for video filming in the nature exhibited, the copy from the Hollywood Police Department, the copy that Carole Telfer showed me at Wayside Honor Ranch, and the copy in the nature that is being exhibited here at the courtroom . . . ." Defendant maintained "that the three copies are disassimilated copies, that they're not perfectly alike copies, and that they have divulginary and arbitrary information of casting of images." He also asked that the police officers who he said had visited him in jail and who had "committed" him "the statements to the four video

record copies that you are the one that committed a serious of murders in a tunnel" be called to testify regarding the "four record copies on their video copy of record of filming in their possession . . . ." The court granted the prosecution's motion to strike the testimony as irrelevant.

The jury convicted defendant of the murder of Fallin, with a special circumstance of murder by lying in wait, and of both attempted murders, but acquitted him on two of the charged murders. He was sentenced to life without possibility of parole, plus two additional life terms.

The Court of Appeal affirmed. The appellate court rejected defendant's argument that the trial court erred in failing to suspend proceedings when counsel raised a doubt about his competence in March 2014. While counsel's description of defendant's behavior "certainly suggested mental illness," the court reasoned, it "did not necessarily constitute substantial evidence of defendant's incompetence." Rather, the court continued, defendant's responses to the trial court's questions suggested competence: "[Defendant] knew he was in a jury trial; he recited the charges against him with precision; he knew that Ms. Telfer was defending him; he was willing to help her; he wanted to go forward with trial; and he apologized for his 'obstructive' and 'belligerent' behavior. The record therefore shows that Rodas understood the nature of the criminal proceedings and could assist counsel in the conduct of a defense in a rational manner." The Court of Appeal acknowledged that defendant's 2013 psychiatric report "connected taking medication to maintaining competence," but reasoned that the report did not *condition* its competence finding on continued medication, and the trial court had "no current medical report

from 2014 describing the effect, if any, of Rodas's failure to take his medication."

We granted defendant's petition for review, limited to the question of whether the trial court erred in failing to suspend the criminal proceedings after defense counsel expressed her doubts as to defendant's competence to stand trial.

## II.
## A.

The constitutional guarantee of due process forbids a court from trying or convicting a criminal defendant who is mentally incompetent to stand trial.  (*People v. Mickel* (2016) 2 Cal.5th 181, 194; U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 15.) Section 1367 of the Penal Code, incorporating the applicable constitutional standard, specifies that a person is incompetent to stand trial "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."  (*Id.*, subd. (a); see *Dusky v. U.S.* (1960) 362 U.S. 402 [competence requires " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " and " 'a rational as well as factual understanding of the proceedings against him' "].)

Penal Code section 1368 requires that criminal proceedings be suspended and competency proceedings be commenced if "a doubt arises in the mind of the judge" regarding the defendant's competence (*id.*, subd. (a)) and defense counsel concurs (*id.*, subd. (b)).  This court has construed that provision, in conformity with the requirements of federal constitutional law, as meaning that an accused has the right "to a hearing on present sanity if he comes forward with substantial evidence

that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense." (*People v. Pennington* (1967) 66 Cal.2d 508, 518, discussing *Pate v. Robinson* (1966) 383 U.S. 375, 385–386.) "Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary." (*Pennington*, at p. 518.) As we have explained in more recent cases, substantial evidence for this purpose is evidence "that raises a reasonable or bona fide doubt" as to competence, and the duty to conduct a competency hearing "may arise at any time prior to judgment." (*People v. Rogers*, *supra*, 39 Cal.4th at p. 847; accord, *People v. Sattiewhite* (2014) 59 Cal.4th 446, 464.)

When a doubt exists as to the defendant's mental competence, the court must appoint an expert or experts to examine the defendant. The issue is then tried to the court or a jury under the procedures set out in Penal Code section 1369. Except as provided in Penal Code section 1368.1 (allowing for probable cause and motion hearings in certain circumstances), all criminal proceedings are to be suspended until the competence question has been determined. (Pen. Code, § 1368, subd. (c).)

If, after a competency hearing, the defendant is found competent to stand trial, a trial court may rely on that finding unless the court " 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153 (*Jones*); accord, *People v. Mendoza* (2016) 62 Cal.4th 856, 884.)

**B.**

Defendant contends that the trial court was presented with substantial evidence of his mental incompetence at the March 2014 hearing and that the circumstances at that time had substantially changed from those prevailing in May 2013, when defendant was found competent to stand trial. We agree. Given the circumstances, the trial court erred by proceeding with trial without undertaking the required formal inquiry into defendant's competence.

First, a brief review of the facts. As the trial court was aware, defendant had a history of mental illness dating at least to 1974, and he was found incompetent to stand trial on criminal charges in 1984 and 1986. In 1988, he was again confined at Atascadero and Patton and diagnosed with schizophrenia. Besides delusional thinking, his communication was disorganized: he spoke in "word salad," using nonsensical terms with no connection to one another.

In 2011 and 2012, experts found him incompetent to stand trial based on his "fragmented" thought processes, "rambling" and "nonsensical" speech and his delusional belief he was misidentified as the person who previously had been confined at Patton. But with psychotropic medication, Dr. Knapke noted in 2012, defendant could probably be returned to a state of mental competence to stand trial. After several months of treatment, a report from Patton found that with medication defendant had shown some progress in reducing symptoms of psychosis. With continued treatment, he likely would regain competence, but without it he likely would not: "There are no effective alternatives to treatment with antipsychotic medication."

15

When, several months later, the Atascadero medical director ultimately certified defendant as competent, the report *twice* cautioned that he should remain on his medication regimen "to prevent mental decompensation and maintain competency related abilities." In a cover letter to the court on filing the certificate of competence, the Atascadero medical director repeated the warning: "It is important that [defendant] remain on this medication . . . to enable him to be certified under Section 1372 of the Penal Code."

In sum, the psychiatric reports and letters in the record established two critical facts. First, defendant's schizophrenia causes him to suffer paranoid ideation and severe difficulties in organizing his thoughts and speech, periodically rendering him incompetent to stand trial. Second, while consistent administration of antipsychotic and mood-stabilizing medication can control these symptoms, maintenance of competence depends on continued medication.

It was against this backdrop that defense counsel informed the trial court in March 2014 that she had formed a new doubt about defendant's competence. At that time, the trial court learned that defendant had stopped taking his medication and his condition had severely deteriorated. Defendant was now focused on a paranoid theory that the videotapes the prosecution was using against him were "assimilations" and that identifications of him as Doudley Brown (his original name, under which he had been previously confined in state hospitals) were somehow "forge[d]." Beyond that, his communications to his attorney were incoherent, consisting of a "word salad" like that reported during his earlier bouts of mental incompetence. Defendant had told counsel he now wanted to testify, contrary to their earlier agreement, but counsel did not understand what

defendant was saying to her and hence did not know "what's going to come out of his mouth" if he took the stand. Taken as a whole, this information constituted substantial evidence of mental incompetence. The facts made known to the court raised a reasonable doubt as to whether defendant was able to communicate rationally with his attorney and thus "to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a).)[3]

In concluding that the trial could proceed, the trial court relied on a brief colloquy with defendant, in which defendant displayed a general understanding of the nature of the proceedings and the charges against him. But nothing in the colloquy dispelled the specific concerns that counsel had raised

---

[3] The record does not support the Attorney General's speculative suggestion that defendant's incoherent communication with counsel was attributable to his use of English rather than Spanish. Defendant's sister testified at trial that he was fluent in both English and Spanish. Defendant was born in Puerto Rico but, according to Dr. Knapke's report, his father was "British from Honduras." On one occasion, defendant insisted to an interviewer that he spoke only Spanish, but he nevertheless "spontaneously began speaking English in the middle of an interview about any problem." The record reflects, moreover, that the problems counsel described arose when defendant was speaking Spanish as well as when he was speaking English. Dr. Knapke also noted that when he interviewed defendant through a Spanish interpreter, defendant began "rambling in a nonsensical manner," and the interpreter told Knapke he was having difficulty understanding defendant because of defendant's "bizarre use of words and syntax." Even to the interpreter, defendant "was using words out of context" and "was not making any sense." In declaring her doubts as to competence, defense counsel explained to the trial court that defendant had previously used a "word salad" in Spanish and was now doing so in English.

about defendant's ability to rationally assist her in conducting his defense. Indeed, the transcript of the colloquy is suggestive of some of the very communication difficulties counsel had described: In response to the court's opening question about how he was doing, defendant responded that he was fine, but then continued: "[I]t is the first time that I made those notes and I had a conversation with Carole Telfer just yesterday. And I really didn't mean to be obstructive to the person's attention. I didn't know that that was the person means. I was being belligerent as how the—antagonistic as how the person said, and I didn't know that I was being obstructive or confrontive."

And critically, while aspects of defendant's performance in this colloquy could be seen as weighing to some degree against counsel's evidence of incompetence, the colloquy did not provide an adequate basis for resolving any conflict in the evidence concerning defendant's competence. In *Pate v. Robinson, supra*, 383 U.S. 375 (*Pate*), the high court made clear that when substantial evidence of incompetence otherwise exists, a competency hearing is required even though the defendant may display "mental alertness and understanding" in his colloquies with the trial judge. (*Id.* at p. 385.) The court explained that while the defendant's in-court behavior "might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue." (*Id.* at p. 386.)

This court has followed the same principle: When faced with conflicting evidence regarding competence, the trial court's role under Penal Code section 1368 is only to decide whether the evidence of incompetence is substantial, not to resolve the conflict. Resolution must await expert examination and the opportunity for a full evidentiary hearing. (*People v. Lightsey* (2012) 54 Cal.4th 668, 703–704; *People v. Pennington, supra*, 66

Cal.2d at p. 518.) Had the issue of defendant's competence been tried to the court under Penal Code section 1369, the trial court might legitimately have weighed defendant's demeanor and the nature of his responses to the court's questioning against the experts' reports and other available evidence relating to his condition. But in the face of substantial evidence raising a doubt about defendant's competence, defendant's demeanor and responses supplied no basis for dispensing with further inquiry.

It is true that, generally speaking, when a defendant has already been found competent to stand trial, "a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*Jones, supra*, 53 Cal.3d at p. 1153.) We have also said that when a competency hearing has already been held, "the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state," particularly if the defendant has "actively participated in the trial" and the trial court has had the opportunity to observe and converse with the defendant. (*Ibid.*)

This rule does not, however, alter or displace the basic constitutional requirement of *Pate, supra*, 383 U.S. at pages 385 to 386, and *People v. Pennington, supra*, 66 Cal.2d at page 518, which require the court to suspend criminal proceedings and conduct a competence hearing upon receipt of substantial evidence of incompetence even if other information points toward competence. The effect of the *Jones* rule is simply to make clear that the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's

competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground.

Whether there has been a change in circumstances sufficient to call for a new competency hearing is necessarily a fact-specific inquiry. Under the facts of this case, however, it is plain that the standard was met; the evidence before the trial court made it unreasonable to continue to rely on the prior competence finding in allowing the trial to proceed. The May 2013 competence finding had followed a finding of *incompetence* in February 2012; in the interim, defendant had been confined in state hospitals and treated with antipsychotic medication. When the competence finding was made, it was based solely on the certification of the medical director, who stated clearly that it was "important that [defendant] remain on this medication . . . to enable him to be certified."[4]

Considering this context, the information presented to the court at the March 2014 in camera hearing showed a substantial change in circumstances since May 2013. At that hearing, the court learned that defendant had stopped taking his antipsychotic medication—on which his prior competence

---

[4] Not only was no evidentiary hearing held at that time, but the court had before it no case file; it made its determination based solely on the "docket sheet," as the judge presiding at the hearing said at the time, or at most on a "dummy file" containing only "the letter from the doctor, finding the defendant competent," as the judge stated in settling the record. Ms. Telfer, who had represented defendant in earlier proceedings and who later represented him at trial, was not present for the May 2013 hearing; two other deputy public defenders stood in for her.

finding was effectively conditioned—and was again displaying symptoms similar to those he exhibited during prior bouts of incompetence. Far from duplicating the evidence considered in the course of making the prior competency finding, this new information painted a starkly different picture from that contained in the medical director's certification. Nothing the trial court heard in its colloquy with defendant negated the showing of changed circumstances—nor, for that matter, did the trial court justify its decision not to declare a doubt after the in camera hearing by any determination that the circumstances had not significantly changed since defendant was found competent in May 2013. This change in circumstances required additional, formal inquiry under Penal Code section 1368.[5]

This conclusion is consistent with that of another published decision of the Court of Appeal, in which the court held that a competency hearing was required under circumstances strongly

---

[5] Even if the information the court received at the March 2014 in camera hearing were not deemed to show substantially changed circumstances from the May 2013 competence finding, defendant's nonsensical and irrelevant testimony during trial, together with counsel's earlier presentation, clearly did so. When the court tried to clarify defendant's testimony that the tape copies were "divulginary and arbitrary information of casting of images" by asking whether defendant was saying the jury had been shown a different tape than he had seen in jail, defendant responded: "No, your Honor, not explicitly that nature. I am just saying that the physical material copies in the fact of knowledge identified consistency, a prototype of the nature of the assimilated nature." Although defense counsel did not at that point renew her caution that defendant appeared incompetent to stand trial, the court's duty to assess competence is a continuing one. (*People v. Sattiewhite, supra,* 59 Cal.4th at p. 464.)

resembling those presented in this case. In *People v. Murdoch* (2011) 194 Cal.App.4th 230 (*Murdoch*), the court held that the trial court was required to suspend criminal proceedings under Penal Code section 1368 when confronted with evidence that the defendant had stopped taking his medication and was pursuing a delusional theory of defense. The defendant there, charged with assault, was found competent to stand trial based on expert reports stating that he was competent so long as he remained medicated. But the same reports noted that defendant had either completely or mostly stopped taking his medication and could "decompensate and become incompetent if he continued to refuse medication." (*Murdoch*, at p. 233.) At trial a few months later, the defendant, now representing himself, told the court that he wanted to introduce parts of the Bible and other books to prove that the alleged victim was not a human being because he did not have shoulder blades, which " 'are symbolic of angelic beings,' " and instead had a single bone that prevented him from shrugging his shoulders. (*Id.* at p. 234.) When the victim testified, the defendant asked him on cross-examination if he could shrug his shoulders. The victim did so, and the defendant stated, " 'That's all I have. This isn't the man that I believe attacked me.' " (*Id.* at p. 235.) The *Murdoch* court held that in light of the experts' reports, which described the defendant's "fragile competence and its evident dependence upon continued medication," and evidence that the defendant had stopped taking that medication, the defendant's bizarre explanation of his defense required new proceedings to determine competence. (*Id.* at p. 237.)

Although the Court of Appeal in this case attempted to distinguish *Murdoch*, the cases are similar in relevant respects. Like the defendant in *Murdoch*, defendant here had been

diagnosed with a mental illness that threatened his trial competence if untreated; as in *Murdoch*, the trial court was faced with evidence defendant had stopped taking his medication and was now insisting on presenting a defense that threatened to be nonsensical or delusional. In this case, the evidence before the court also showed that defendant could no longer communicate rationally with his attorney about his defense. In both cases, the defendants' behavior, in combination with the warnings of the health professionals about the likelihood that they would become incompetent if they did not take antipsychotic medication, was substantial evidence giving rise to a doubt as to their competence. Here, as in *Murdoch*, the trial court was required to suspend proceedings and launch a formal inquiry to resolve the matter.

## C.

The Attorney General raises two main arguments in defense of the trial court's ruling, but neither is persuasive. The Attorney General first attempts to minimize the concerns defense counsel raised at the March 2014 hearing, arguing that defendant's note and remarks to counsel do not reflect delusional thinking on par with that of the *Murdoch* defendant. We grant there are differences between the *Murdoch* defendant's mental state and the mental state of defendant in this case. But the differences do not render defendant's condition less concerning from the standpoint of due process. Defendant's insistence that the prosecution's videotapes were "assimilations" and that the accusation against him involved some type of "forgery" of his identity reflected paranoid thinking like that he had displayed in previous episodes of mental incompetence. And defendant's descent into speaking in "word salad" in response to questions about his desire to change trial

strategy—which had also characterized his previous episodes of incompetence—showed him unable to coherently discuss his defense with counsel, which meant he could not rationally assist his attorney with his defense.

Second, echoing the Court of Appeal's rationale, the Attorney General also argues that the record does not clearly establish the connection between the administration of medication and defendant's competence. The medical reports in the record, the Attorney General contends, did not "necessarily condition" his mental competence on continued medication. And the record contains no contemporaneous medical report indicating that defendant's symptoms had returned after he stopped taking his medication.

For reasons already stated, we disagree with the Attorney General's characterization of the medical reports in the record. While the reports did not state in so many words that defendant would decompensate and become incompetent if he stopped taking his medication, the reports did make several points clear: that defendant had been incompetent while unmedicated; that defendant had required involuntary medication to be restored to a state of competency to stand trial; that for defendant "[t]here are no effective alternatives to treatment with antipsychotic medication"; that "to prevent mental decompensation and maintain competency related abilities," defendant should continue his medication; and that it was "important" for defendant to remain on medication "to enable him to be certified" as competent to stand trial. Given that human psychology rarely involves absolutes, a closer link between continued medication and defendant's mental competence could hardly be demanded.

The Attorney General is correct that the court did not have the benefit of expert reports or testimony evaluating defendant's condition after he stopped taking his medication in 2013 or 2014.[6] But under the circumstances, substantial evidence of incompetence existed without such a report. The court already had the benefit of the medical reports described above, which related to defendant's history of incompetence while unmedicated and which made clear that medication should be continued to ensure that defendant's competence continued. At the March 2014 hearing, the trial court learned not only that defendant had ceased taking his medication, but also that he had begun displaying some of the same symptoms he had displayed during earlier periods of incompetence and, as a consequence, was unable to communicate rationally or coherently with his attorney. As in *Murdoch, supra,* 194 Cal.App.4th at pages 236 to 238, the evidence before the court went beyond a simple report that defendant was speaking or acting bizarrely; against the background of medical reports detailing defendant's history of schizophrenia and the importance of medication in controlling his symptoms, counsel's report raised a reasonable doubt as to defendant's continued competence. To the extent a new expert examination and report were needed to resolve that doubt, the procedures are contained in Penal Code section 1369, subdivision (a). The court could not properly proceed with the criminal trial without first invoking those procedures to determine whether defendant was competent.

---

[6] A psychiatrist testified for the defense at trial, but did not examine defendant or prepare any written report.

## III.

A question remains as to the appropriate remedy. The Attorney General asks that if we determine the trial court was required to suspend criminal proceedings and hold a competency hearing following the March 2014 hearing, we order the case remanded to the trial court for a hearing to determine whether defendant was in fact competent at the time of his trial.

This court has never decided whether remand for such a retrospective competency hearing is an appropriate remedy for what we have sometimes referred to as *Pate* error—that is, a court's due process error in failing to suspend criminal proceedings and determine the defendant's competence. In *Pate* itself, the high court rejected a proposal to remand for a retrospective competency hearing, citing the difficulty of determining the defendant's competence some six years after the fact. (*Pate*, *supra*, 383 U.S. at p. 387.) The court did the same in *Drope v. Missouri* (1975) 420 U.S. 162, 183 (*Drope*), emphasizing "the inherent difficulties of such a *nunc pro tunc* determination under the most favorable circumstances."

For many years, these decisions were generally understood to mean automatic reversal was the only remedy for *Pate* error. (*People v. Lightsey*, *supra*, 54 Cal.4th at p. 704 (*Lightsey*).) But at some point, some courts began to take a different view, concluding that retrospective competency hearings might in some instances be feasible and appropriate. This included the Court of Appeal in *People v. Ary* (2004) 118 Cal.App.4th 1016, 1029 (*Ary I*), which remanded to the trial court to determine whether a retrospective hearing was feasible where the record contained "extensive expert testimony and evidence . . . regarding defendant's mental retardation and his ability to

function in the legal arena" at the time of his disputed competence. When the same case later arrived at this court for review, we assumed, without deciding, that this remedy was permissible. (*People v. Ary* (2011) 51 Cal.4th 510, 516–517 (*Ary II*).) We emphasized, however, that if the remand procedure is in fact permissible, it requires the trial court to "first decide whether a retrospective determination is indeed feasible. Feasibility in this context means the availability of sufficient evidence to reliably determine the defendant's mental competence when tried earlier." (*Id.* at p. 520.)

In *Lightsey*, we again declined to answer the question whether a retrospective competency hearing is ever an available remedy for *Pate* error, deeming the question "complex and subject to debate." (*Lightsey*, *supra*, 54 Cal.4th at p. 704.) We instead concluded that such a hearing might be an appropriate remedy for a different sort of error—namely, a trial court's error in failing to appoint counsel to represent a defendant in a competency hearing. (*Id.* at pp. 702, 706–710.) In so holding, we distinguished cases of *Pate* error, explaining: "[D]espite the error in the manner in which the competency proceedings were conducted, the subject of defendant's mental competence actually was reviewed at the time of the trial and contemporaneous evidence specifically addressing that issue presumably still exists." (*Id.* at p. 707.) "In contrast, in the circumstances of *Pate* error, where there was substantial evidence of incompetence but no proceedings to develop the record further, there is by definition a shortcoming in the evidence, and the trier of fact at a retrospective competency hearing would have to rely on after-the-fact opinions and evidence in the record (such as the defendant's courtroom behavior) that might only circumstantially assist in determining

the defendant's mental state at the time of trial." (*Id.* at pp. 707–708.)

Assuming that in some circumstances a retrospective hearing may be proper when the trial court has erred in failing to hold a competency hearing, we conclude that here, much as in *Pate* and *Drope*, "the inherent difficulties of such a *nunc pro tunc* determination" (*Drope*, *supra*, 420 U.S. at p. 183) cannot be overcome under the circumstances of the case. As we have previously explained, the critical question in determining whether a retrospective competency hearing is feasible is whether there is "sufficient evidence to *reliably* determine the defendant's mental competence when tried earlier." (*Ary II*, *supra*, 51 Cal.4th at p. 520, italics added.) The burden of proof in a retrospective hearing is on the defendant, and feasibility requires finding that such a hearing "will provide defendant a *fair opportunity* to prove incompetence, not merely [that] some evidence exists by which the trier of fact might reach a decision on the subject." (*Lightsey*, *supra*, 54 Cal.4th at p. 710.)

Several factors might bear on this inquiry. (See *Ary II*, *supra*, 51 Cal.4th at pp. 516–517 [suggesting various factors that might be relevant to the feasibility of retrospective competency hearings].)[7] Here, however, the dominant

---

[7] In *Ary II*, *supra*, 51 Cal.4th 510, we declined to address the theoretical question whether *Pate* error may ever be cured by a retrospective competence hearing. (*Ary II*, at pp. 516–517.) In dicta, however, we discussed the feasibility of such hearings, citing with approval an appellate decision identifying four factors bearing on feasibility: the passage of time, the availability of contemporaneous medical evidence, any statements by defendant in the trial record, and the availability of individuals who interacted with defendant before and during trial. (*Id.* at p. 520, fn. 3.)

considerations are the fluctuating nature of defendant's symptoms, the passage of time, and the lack of contemporaneous expert evaluations. To saddle defendant with the burden of proving his incompetence in March 2014, around five years after the fact, without the benefit of any contemporaneous psychiatric, psychological, or neurological evaluation, would neither be fair nor produce a reliable result. Without any significant prospect of evidence showing competence being produced, moreover, a retrospective hearing could not feasibly cure the *Pate* error.[8] Defense counsel already put her negative view of defendant's competence on the record at the trial's outset, and defendant's testimony at trial only served to reinforce counsel's showing that his mental condition made it impossible for him to rationally assist in his defense.

---

[8]  Here, as in all cases of *Pate* error, the trial record itself supplies substantial evidence of defendant's incompetence. The critical question is not whether the trial court could reliably find, on the basis of this evidence, that defendant was in fact incompetent. The critical question, rather, is whether the trial court could reliably find *competence*: whether evidence exists both to show defendant's competence at the time of trial and to permit defendant to respond fully to that showing, such that a fair and reliable determination that defendant was competent to stand trial could be made.

We recognize that a retrospective hearing might be thought technically "feasible" as long as the court had information sufficient to make a determination either way. But it would serve no purpose to remand for a hearing that could do no more than confirm that defendant was incompetent at the time of trial; our analysis therefore focuses on the feasibility of holding a hearing that could fairly and reliably show that defendant was in fact competent at the time of trial.

Had the trial court declared a doubt about competence in March 2014, the court would have appointed two experts to examine defendant and report on aspects of his mental condition relevant to competence, as well as the appropriateness of medical treatment for any condition found. (Pen. Code, § 1369, subd. (a).) Such evaluations would have been crucial in determining whether defendant's failure to adhere to his drug regimen had resulted in a return of his schizophrenic symptoms to such a degree as to render him once more incompetent. A retrospective hearing, in contrast, would presumably require an attempt by psychologists or psychiatrists to reconstruct defendant's mental condition at trial based on the prior medical reports and defendant's behavior at the time of trial. But the most recent expert evaluation, dating from April 2013, tied defendant's competence to continuation of his medication. Given the showing that by March 2014 defendant had long since stopped taking his medication and had suffered a significant relapse into a more florid psychotic condition, it is difficult to see how a psychologist or psychiatrist appointed to make a retrospective evaluation could reliably find defendant was nonetheless competent at the time of trial. Under the particular circumstances of this case, at a distance of around five years and without any expert evaluations from the time of trial, we do not believe the trial court could fairly come to a reliable conclusion that defendant was competent at that time.

By contrast, when courts have permitted retrospective hearings, they have generally done so in cases involving unusual circumstances where reliable evidence of the defendant's mental condition at the time of trial would be available at the hearing. (See *Ary I, supra,* 118 Cal.App.4th at p. 1028; *Tate v. State* (Okla.Crim.App. 1995) 896 P.2d 1182, 1188 ; cf. *Lightsey, supra,*

54 Cal.4th at pp. 707-708 [retrospective hearing might be feasible to cure the error of failing to appoint counsel for the defendant at the original competence hearing].) Absent such contemporaneous evidence here, and given the fluctuating nature of defendant's symptoms and the considerable passage of time, we conclude no retrospective competency hearing could " 'place[] [defendant] in a position comparable to the one he would have been placed in prior to the original trial.' " (*Ary II*, *supra*, 51 Cal.4th at p. 520.)

Without either approving or foreclosing the possibility that a retrospective hearing might be found feasible in other cases of *Pate* error, we hold that under the circumstances of this case such a hearing would not supply an adequate remedy.

## IV.

We reverse the judgment of the Court of Appeal and remand the matter to that court with directions to reverse the judgment of conviction. Defendant may be retried on the charges for which he was convicted if he is not presently incompetent to stand trial.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KLINE, J.**[*]

---

[*]     Presiding Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rodas

_____

**Unpublished Opinion** XXX NP opn. filed 8/15/16 – 2d Dist., Div. 3
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S237379
**Date Filed:** November 26, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert J. Perry

_____

**Counsel:**

Joanna McKim, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer, Susan Sullivan Pithey and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Joanna McKim
P.O. Box 19493
San Diego, CA  92159
(619) 303-6897

Zee Rodriguez
Deputy Attorney General
300 South Spring Street, Suite 1700
Los Angeles, CA  90013
(213) 576-1342