Filed 1/12/26  P. v. St. John CA6

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL ST. JOHN,<br><br>    Defendant and Appellant. | H052360<br>(Santa Cruz County<br> Super. Ct. No. 22CR05024) |

Following termination of his pretrial mental health diversion under Penal Code section 1001.36, [1] appellant Michael St. John pleaded no contest pursuant to a negotiated agreement to grand theft (§ 487, subd. (c)) and was sentenced to an upper term of six years in prison.  On appeal, St. John argues that reversal is required because the trial court at sentencing was presented with substantial evidence that raised a reasonable doubt as to his competence but failed to hold a competency hearing.  Finding no error, we affirm the judgment.

## I.    BACKGROUND

In November 2022, St. John approached a woman and her child, slapped a laptop out of the woman's hands, and took the laptop to a different location. [2]  The Santa Cruz

---

[1] Unspecified statutory references are to the Penal Code.

[2] St. John stipulated to these facts when he pleaded no contest to grand theft.

County District Attorney charged St. John with robbery (§ 211), further alleging that St. John had a prior conviction that qualified as a strike (§ 667, subds. (b)–(i)).

## A. *St. John's Request for Mental Health Diversion*

In February 2024, St. John applied for mental health diversion under section 1001.36, based in part on an evaluation prepared by Gregory L. Katz, Ph.D. Diagnosing St. John with "Bipolar Disorder, Most Recent Episode Manic, Severe," alcohol use disorder, and stimulant use disorder, Katz opined that St. John's mental health was a significant contributing factor to the charged offenses and that treatment with psychotropic medications and ceasing alcohol and drugs would improve his condition.

Katz's report summarized St. John's extensive mental health history, including a prior Welfare and Institutions Code section 5150 hold in August 2020 and multiple hospital and emergency room visits stemming from disruptive behavior and either alcohol or drug use. During an interview, Katz found St. John to be "disorganized," "tangential," and "frequently digressive," with impaired insight, reasoning, and judgment. Katz also found St. John to be "mildly grandiose" in that he asserted that he was a fulltime college student with a Fulbright scholarship. St. John provided Katz with a "disorganized and rambling description" of his mental health history, which included multiple moves, arrests, alcohol and drug use, stints of homelessness, and a diagnosis of schizophrenia. In many instances, St. John's arrests followed either his use of alcohol or drugs or his cessation of medication.

Around the time of the offenses, St. John had been going through withdrawal. When he saw the victim with the laptop, he thought the "information on the computer was the 'terrorist material (he) needed to get and grabbed it.' " Since his arrest, St. John had started taking "L[i]thium Carbonate, 300 mg" and no longer experienced the delusions that he had at the time of the offense.

2

**B.** *The Trial Court's Grant of Mental Health Diversion*

In April 2024, the trial court held a hearing on St. John's request for mental health diversion. St. John had been accepted into a Salvation Army program and said that he had "the full intention, capacity to complete this program." St. John explained that "Lithium XRs [were] able to take away anything that's negative or bad thoughts." His counsel mentioned that St. John was also taking Trazodone.

The trial court observed that just three months earlier, St. John had presented as "obsessing, grandiose"—"very different[]" than now, when he was "calmer" and "more able to focus on what we are doing here in court." And that just three months ago, the trial court had been unsure "whether or not [St. John] could even be treated." The trial court urged St. John to "maintain [his] medication because that is the key" and granted St. John's request for mental health diversion over the People's objection.

**C.** *Mental Health Diversion Review and Violation Report*

In May 2024, the trial court held a diversion review hearing. Defense counsel explained that the Salvation Army "could not comply with [St. John's] mental health regimen" but that St. John was now "hooked in" with the "Santa Clara Mental Health" team. The trial court, however, noted that St. John had been terminated from the Salvation Army program for disciplinary reasons ("refusing to sign a write-up for stealing from the program's warehouse") and had also been "booked into San Jose County Jail for vandalism."

St. John told the trial court that he was working with a case manager in San Jose and was residing in a reentry center and that he assumed that the probation department had been informed of this. Concluding that St. John "has a higher level of need that we can immediately service," the trial court placed St. John on supervised release subject to GPS monitoring.

3

Later that month, the probation officer reported that St. John had either tampered with or cut off his GPS monitoring device.  And in June 2024, the matter was set for a hearing to terminate St. John's mental health diversion.

**D.** *The Plea and Sentencing*

In July 2024, rather than continue St. John on diversion, the prosecutor amended the count of robbery to grand theft (§ 487, subd. (c)), and St. John pleaded no contest to the amended count, admitting the prior strike conviction and the aggravating factor that the victim was particularly vulnerable.

At the sentencing hearing two weeks later, St. John addressed the court, defending his performance on diversion.  He argued that "this is a situation where it was brought to my attention that I was . . . eighty-sixed from every program in Santa Cruz [because] I burned bridges with Encompass."[3]  St. John argued that when he was in San Jose, he had been "displaced" and that his "trajectory was to go to a program . . . in Santa Cruz" called "El Dorado Center, Telos, and then an SLE [(Sober Living Environment)]."  St. John stated that he had a "motion . . . ratified" in April and that a "module opened up in the county jail" that permitted him to "transfer [his] Medi-Cal from Monterey to here." St. John added that his collaborative court assessment was "botched."  St. John explained that one of his attorneys had told him that he could not go to the "Jericho Project" because they would not accept individuals with ankle monitors, and he had called the Jericho Project and "got a very weird vibe from them."  St. John again reiterated that he believed that his issue with the Encompass program had "permeated every facet in [his] defense."  St. John explained that he wanted to come to Santa Cruz due to its proximity to the university he attended and that he was a transfer student majoring in business.

_____

[3] St. John's statements at the sentencing hearing suggest that Encompass is a provider of certain recovery or mental health services.

4

The trial court said that it had no interest in reinstating diversion. St. John responded that he was "fine with whatever you decide" and that "this was always a mental health issue." St. John explained that he had "detailed" the situation with his ankle bracelet "in the 22 pages" and had contacted defense counsel "incessantly," including at "3:00 in the morning from the sobering center." St. John then reiterated that he had trouble with his mental health program and that "[his] circumstances in San Jose due to this Encompass issue and the recovery community" put him in a difficult situation. St. John expressed frustration with defense counsel, noting that he had attempted to contact defense counsel multiple times and counsel sometimes did not reply. St. John then stated that his mother was "dying" and that he had issues with the jail not giving him his glasses. At one point, the trial court interjected that "we are way off track." But St. John persisted in addressing the court, noting that he had issues with his medication in jail and that his plan was to leave the country for Thailand—and that he was encountering "extremely abusive behavior by jail staff[,] both medical and regular."

St. John then disclosed that he had stopped taking Trazodone, "[a]s of [July 1]," suggesting that the medication had been "removed . . . by the jail psychiatrist" from his regimen but that nursing staff were incorrectly noting "refusals" on his chart. St. John also suggested that he had never been consulted about including Trazodone in his regimen. The trial court interrupted St. John and told him that "[t]hat's part of the transition" and that he had to "continue to advocate for [him]self with medical staff."

The trial court then imposed the agreed-upon term of six years—the upper term of three years doubled due to St. John's prior strike. St. John stated that his issues with defense counsel would be "heavily mentioned in [his] appeal" and that "[t]he last note that I want to say is that when an attorney and then the mental health coordinator tells you that a multi-million dollar private umbrella corporation has a vendetta against you, it hurts every step that you take to try to get recovery here in the neighboring county, and that's what my situation was."

5

St. John timely appealed without seeking a certificate of probable cause.

## II.    DISCUSSION

### A.    *Legal Principles and Standard of Review*

On appeal, St. John argues that the trial court erred by proceeding with sentencing when there was substantial evidence for the trial court to doubt his competence.[4] At any time before judgment, if "a doubt arises in the mind of the judge as to the mental competence of the defendant, the judge shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent." (§ 1368, subd. (a).) "A defendant is incompetent to stand trial if he or she lacks ' "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as a factual understanding of the proceedings against him." ' " (*People v. Rogers* (2006) 39 Cal.4th 826, 846–847 (*Rogers*).)

An opinion from a qualified mental health expert who states under oath that a defendant is incapable of understanding the proceedings or is incapable of assisting in the defense constitutes substantial evidence of incompetence. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 270 (*Ghobrial*).) "But absent such testimony, no single factor is necessary to establish sufficient doubt of a defendant's competence as to require a hearing. Rather, a court must consider the 'aggregate of th[e] indicia' of the defendant's competence." (*Ibid.*) "Evidence of incompetence may emanate from several sources, including the

_____

[4] Preliminarily, the Attorney General argues that St. John's appeal should be dismissed absent a certificate of probable cause. But St. John's challenge to a trial court's *postplea* failure to hold a competency hearing is not a challenge to the validity of the plea that would require the trial court's certification of probable cause. (See *People v. Oglesby* (2008) 158 Cal.App.4th 818, 826–827; cf. *People v. Mendez* (1999) 19 Cal.4th 1084, 1100 [challenge to a *preplea* determination of mental competence is a "certificate issue[]" that goes "to the legality of the proceedings, and, specifically, the validity of [the] guilty plea"].)

6

defendant's demeanor, irrational behavior, and prior mental evaluations." (*Rogers*, *supra*, 39 Cal.4th at p. 847.) And a trial court is required to hold a section 1368 hearing only if there is substantial evidence of incompetence: "[E]vidence 'that does no more than form the basis for speculation regarding possible current incompetence is not sufficient.' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 431.)[5] The duty to suspend criminal proceedings does not arise when "there is merely a doubt as to the existence of a mental disorder or developmental disability that does not implicate a defendant's competency to stand trial." (*People v. Romero* (2008) 44 Cal.4th 386, 420.)

We defer to a trial court's decision whether to hold a competency hearing "because the court has the opportunity to observe the defendant" in the underlying proceedings. (*Rogers*, *supra*, 39 Cal.4th at p. 847.) "Unless the record contains substantial evidence of present mental incompetence, we review a trial court's failure to initiate the competency inquiry only for abuse of discretion." (*People v. Johnson* (2018) 6 Cal.5th 541, 575 (*Johnson*).)

**B.** *Analysis*

St. John has not shown substantial evidence of incompetence. He relies primarily on his complaints about his counsel and the trial court's efforts to redirect him at the

_____

[5] St. John alternatively argues that a lower standard than substantial evidence should trigger a trial court's duty of inquiry, citing *People v. Campbell* (1987) 193 Cal.App.3d 1653 for the proposition that, faced with a "reasonable possibility" that a defendant is incompetent, "the trial court must order a psychiatric examination before deciding there is no need for a section 1368 hearing." (*Id.* at p. 1663.) But this statement in *Campbell* is dictum and in context merely directory, not mandatory: The *Campbell* court itself framed the issue in terms of a trial court's "duty to determine whether there is substantial evidence to require a full section 1368 hearing" and ultimately concluded that no hearing was required. (*Ibid.*) The California Supreme Court has characterized the *Campbell* dictum as an "alternative formulation[]" to a competency claim—reaffirming that "[a]bsent a reasonable doubt as to defendant's mental competence, the trial court had no obligation to pursue the matter further." (*People v. Howard* (1992) 1 Cal.4th 1132, 1164, fn. 12, abrogated on a different point as stated in *People v. Rhoades* (2019) 8 Cal.5th 393, 425, fn. 12.)

7

sentencing hearing. But these reflect neither an inability to communicate with his counsel with a reasonable degree of rational understanding nor a failure to understand the proceedings. (*Rogers*, *supra*, 39 Cal.4th at pp. 846–847.) We therefore find no abuse of discretion in the trial court's proceeding without competency proceedings. (*Johnson*, *supra*, 6 Cal.5th at p. 575.)

The record reflects that St. John was dissatisfied with counsel, but a rocky relationship with defense counsel is not indicative of an inability to communicate. (See *Johnson*, *supra*, 6 Cal.5th at pp. 575–576.) And what St. John at the sentencing hearing complained of was his difficulty in achieving contact with defense counsel—noting twice that he had called defense counsel "incessantly" but that counsel had not returned his phone calls until later—not any difficulties communicating with counsel once contact was made. A defendant who has a mental disorder is not automatically incapable of assisting defense counsel or of understanding the proceedings. (See *People v. Ramos* (2004) 34 Cal.4th 494, 510–511 [no abuse of discretion when trial court failed to conduct a competency hearing when defendant was diagnosed with paranoid personality disorder]; *People v. Rodriguez* (2014) 58 Cal.4th 587, 625 [no substantial evidence of incompetency even when defendant and attorney had "expressed concern that some of her conditions of confinement were affecting her mental state and her ability to prepare a defense"].) And "to be entitled to a competency hearing, 'a defendant must exhibit more than . . . a preexisting psychiatric condition that has little bearing on the question . . . whether the defendant can assist his defense counsel.' " (*Rogers*, *supra*, 39 Cal.4th at p. 847; *People v. Mickel* (2016) 2 Cal.5th 181, 203–204 [history of mental illness not necessarily substantial evidence of incompetence].)

Additionally, it is significant though not determinative that counsel himself at no point suggested that St. John was incompetent. Despite St. John's complaints about counsel, it is clear from the record that they were in communication with each other about his mental health diversion and his eventual plea. Defense counsel thus interacted

8

regularly with St. John and was "in the best position to evaluate whether [St. John] is able to participate meaningfully in the proceedings." (*Rogers*, *supra*, 39 Cal.4th at p. 848.) Yet at no point did counsel raise any concerns.

Nor was there any substantial evidence that St. John was unable to understand the proceedings. To the contrary, St. John was also able to advocate on his own behalf during the sentencing hearing. Despite some hyperbolic references—at one point, analogizing his situation to a Bugatti that "exploded" and a claim that a "multi-million dollar private umbrella corporation" had a "vendetta" against him[6]—St. John was largely able to make rational arguments on his behalf. He argued to the trial court that he had been unable to get into certain programs because of Encompass, he offered an explanation for his GPS monitor, and he expressed his frustration with defense counsel.

While the trial court repeatedly redirected St. John during the sentencing hearing, the court did so because St. John persisted in attempts to explain or excuse his performance on diversion, even though diversion had been terminated and the case resolved by St. John's plea bargain. When St. John continued making arguments unrelated to sentencing, the trial court reiterated that it was not interested in "going back" and "reinstating [St. John's] diversion." St. John's attempts to redirect the court's focus to why he was unable to complete diversion suggests that he was aware of and hoped to forestall his imminent negotiated sentence, not that he was incompetent and unable to understand the proceedings. The persistence of even unrealistic hope is not incompetence. The trial court, presiding over the matters with St. John, had the opportunity to observe and assess St. John's competency firsthand, and its decision not to suspend proceedings is entitled to great deference. (*Rogers*, *supra*, 39 Cal.4th at p. 847;

_____

[6] In context, we understand St. John to be referring to Encompass, as he stressed that the "Encompass issue" had made it difficult for him to obtain services.

*People v. Panah* (2005) 35 Cal.4th 395, 433–434 [noting that trial court had observed the defendant "repeatedly" assisted in his own defense].)

We recognize that some of St. John's statements at sentencing were unexplained and could be described as either pressured or unfocused rather than cogent or succinct. But "[u]nder the applicable substantial evidence test, 'more is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense.' " (*People v. Davis* (1995) 10 Cal.4th 463, 527; *People v. Koontz* (2002) 27 Cal.4th 1041, 1064 (*Koontz*) [various examples of a defendant's "rambling, marginally relevant speeches" may constitute evidence of mental illness but does not show the defendant lacked ability to understand proceedings or assist in defense]; *People v. Hines* (2020) 58 Cal.App.5th 583, 605 ["[t]he California Supreme Court has noted bizarre outbursts are not sufficient to require a competency hearing"].)  For example, in *People v. Bloom* (2022) 12 Cal.5th 1008 (*Bloom*), the California Supreme Court found no error in the trial court's decision not to hold a competency hearing even when the defendant engaged in "odd behaviors" throughout his retrial including calling a mental health expert " 'a Christian spy' " and suggesting that "there were poisoned ants on cookies provided by the jail," among others.  (*Id.* at p. 1032.)  The record here instead suggests that despite some outlandish or unsubstantiated remarks seeking to mitigate his failures on diversion and assign blame to others, St. John "understood the proceedings and could assist in his defense." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 406.)

Nor is there any expert testimony that called into question St. John's competence, and Katz's expert opinion did not by itself suggest St. John was incompetent.  St. John aptly characterizes Dr. Katz's report as evidence of his lengthy history of acute mental illness, psychosis, and need for psychiatric treatment.  But Katz did not assess St. John's

competency, nor are we able to infer from the report that Katz believed St. John to be incompetent. And though there is ample support in the record that St. John faced mental health struggles, "the record simply does not show that he lacked an understanding of the nature of the proceedings or the ability to assist in his defense." (*Koontz*, *supra*, 27 Cal.4th at p. 1064.) "[E]vidence of mental illness alone is not sufficient to raise a doubt about a defendant's competence to stand trial." (*Ghobrial*, *supra*, 5 Cal.5th at p. 271.) Simply put, "at no point did any mental health expert ever opine that defendant was *unable* to assist his attorney or understand the proceedings against him." (*Johnson*, *supra*, 6 Cal.5th at p. 575.)

St. John nonetheless argues that the trial court should have halted proceedings when he alluded to no longer taking Trazodone. But in the same disclosure, St. John suggested the "remov[al]" of this one medication was by the jail psychiatrist. And even if St. John's statements are reasonably construed to mean that he refused Trazodone against psychiatric advice, nothing in the record suggests that Trazodone treatment was the linchpin to St. John's competence. *People v. Rodas* (2018) 6 Cal.5th 219 (*Rodas*), upon which St. John relies, is distinguishable. In *Rodas*, the California Supreme Court held that the trial court erred by failing to suspend proceedings for an unmedicated defendant given, among other circumstances, a report that defendant should remain on medication regimen to " 'maintain competency related abilities.' " (*Id.* at p. 232.) The defendant's prior competency certification had been "effectively conditioned" on his antipsychotic medication; thus, the defendant's unmedicated status was a "substantial change" in his circumstances. (*Id.* at p. 235.)

To be sure, Katz opined in his report that treatment with psychotropic medications and ceasing use of drugs and alcohol would "improve [St. John's] mental health condition" as his "mental state improves significantly when free of substance use." And the trial court indicated when granting diversion that St. John's medication regimen was "key." But Katz's opinion was not specific to St. John's use of Trazodone. St. John

11

himself at the diversion hearing credited Lithium, not Trazodone, with his improvement, by "tak[ing] [a]way anything that's negative or bad thoughts." Trazodone was only mentioned by defense counsel as a second medication that St. John was taking. And nothing in the record suggests that St. John had halted his Lithium use.

More importantly, Katz was addressing St. John's suitability for diversion, not whether a certain medication regimen was necessary for St. John's continued competency. Unlike *Rodas*, there was thus no expert testimony or evidence that without certain medication, St. John lacked the ability to communicate with his attorney or to advocate for himself. (Cf. *Rodas*, *supra*, 6 Cal.5th at p. 235; *People v. Murdoch* (2011) 194 Cal.App.4th 230, 237 [competence was predicted upon medication compliance]; *Miles v. Stainer* (9th Cir. 1997) 108 F.3d 1109, 1112 [psychiatric reports warned that "future competence depended on [defendant's] continued use of medication"].) "[A]bsent any evidence that defendant's competence hinged on compliance with a medication regimen," the trial court had no duty to further inquire into St. John's medication compliance. (*Bloom*, *supra*, 12 Cal.5th at p. 1033.)

Lastly, St. John argues that his postsentencing request under *People v. Marsden* (1970) 2 Cal.3d 118 and his notice of appeal raise questions about his competency. But as these documents were not before the trial court at sentencing, we do not consider them. In assessing a claim of error, " '[w]e do not require a trial court to evaluate a defendant's competence based on evidence not before it at the time of its decision.' " (*Ghobrial*, *supra*, 5 Cal.5th at p. 270.)

That St. John undisputedly suffered from mental health issues is not, without more, substantial evidence of incompetence at the time of sentencing. On this record, we cannot find that the trial court abused its discretion by not conducting a competency hearing sua sponte. (*Johnson*, *supra*, 6 Cal.5th at p. 575.)

## III.   DISPOSITION

The judgment is affirmed.

12

_____

LIE, J.

WE CONCUR:

_____

GROVER, Acting P. J.

_____

WILSON, J.

*People v. St. John*
H052360