Filed 10/2/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUNIOR TEJEDA,<br><br>    Defendant and Appellant. | D075364<br><br><br>(Super. Ct. Nos. FSB1302508,<br> FSB1202797) |

APPEAL from a judgment of the Superior Court of San Bernardino County,

Harold T. Wilson, Jr., Judge.  Reversed.

Robert Jason Booher, under appointment by the Court of Appeal, for Defendant

and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G.

McGinnis, Deputy Attorneys General, for Defendant and Appellant.

Junior Tejeda was twice found incompetent to stand trial for murder and robbery charges due to his persistent belief that his actions were controlled by a "mind control project" run by the federal government. He was later found competent after the trial court determined he could compartmentalize any lingering delusion and separate it from his defense. But at trial Tejeda took the stand against his counsel's wishes, admitted guilt for the murder and robbery, and explained that "the project" controlled his actions. The trial court did not declare a doubt as to Tejeda's competency, and he was convicted and sentenced to multiple life terms. As we explain, the Supreme Court's recent decision in *People v. Rodas* (2018) 6 Cal.5th 219 (*Rodas*) compels us to conclude that the trial court should have declared a doubt as to Tejeda's competency once it became clear he could no longer separate his delusion from his defense, as that was the entire basis for his prior competency finding. On our record, its failure to do so requires that we reverse the judgment for retrial if and when Tejeda is found competent.

FACTUAL AND PROCEDURAL BACKGROUND

This case has a complex history. The same convenience store was robbed in 2009 and 2012, and during a separate robbery attempt in 2010 the store owner was killed. The 2009 and 2010 crimes went unsolved until 2012, when Tejeda confessed to all three. He was charged with the 2010 and 2012 offenses, and evidence of the 2009 robbery was introduced to prove identity. For substantial periods of time, criminal proceedings were suspended because Tejeda was twice found incompetent to stand trial. These events, and his ultimate competency finding, bear on this appeal.

Amarjit S. owned Best Market convenience store in San Bernardino; Francisco C. worked for him. Around 10:00 p.m. on November 8, 2010, Francisco was mopping in the back. Tejeda entered, demanded money from Amarjit, then shot him dead and left, taking nothing. A dark jacket matching the one seen in the surveillance video was found at Tejeda's residence, but Tejeda told detectives he was not involved. Tejeda committed another robbery at the same store in 2009, which also initially remained unsolved.

In June 2012, Best Market had a new owner, who worked with his brother. While the brother was restocking in the back, Tejeda entered and demanded money. He lifted his waistband to reveal a gun, prompting the owner to call for his brother. When the brother emerged, Tejeda pointed his gun and both brothers raised their arms. Tejeda took around $45 and ran away. Police located Tejeda at a nearby residence. They found a pellet gun with its orange tip removed and trash bags containing cash and clothes. The Best Market owner identified the grip of the gun as matching the one used in the robbery; both brothers identified Tejeda as the perpetrator.

The San Bernardino District Attorney charged Tejeda in connection with the 2012 robbery in case No. FSB1202797 (the robbery case). Tejeda entered a waiver pursuant to *Faretta v. California* (1975) 422 U.S. 806, 834−835, and the court relieved appointed counsel. He proceeded to write several letters to detectives seeking to provide information about the unsolved crimes in exchange for certain items. In his first letter, he asked for a segregated cell with a television, $200 in his inmate trust account, a double bacon cheeseburger, strawberry milkshake, and chili pork burrito, stamped envelopes, legal pads, pencils, media contacts, and an exclusive interview. He asked for "full

3

understanding" and to be taken seriously, asserting "the aspect of mine being a government mind control project is not craziness but pure truth." In another letter, Tejeda admitted accidentally killing the Best Market owner in 2010 and asked for burgers, fries, burritos, and a soda.

A detective with the San Bernardino Police Department brought Tejeda to the station for an interview in July 2012. Tejeda claimed the U.S. government controlled his brain with magnetic pulses and manipulated him to rob Best Market in 2009 and 2012. When asked about the 2010 murder, Tejeda hesitated. He requested pencils, notepads, erasers, $200, and addresses to 20 news stations to continue, but the detective told him he could not make deals in return for a confession. Eventually, Tejeda agreed to write out a confession and press release. In these documents, he confessed to the murder but emphasized: "It must be understood that I am 100% the subject of a United States government mind control experiment project that is on-going." "Suggestional thoughts" were inserted into his brain, hypnotizing him and causing him to pull the trigger. President Barack Obama was "fully aware" of the project. Tejeda wanted Obama to admit to his face, "Ay bro, you're a project." When the detective asked if he had spoken to any psychiatrists, Tejeda said he had, many times. They thought he was crazy, but in truth he was part of a mind control project. Tejeda admitted being diagnosed as schizophrenic and bipolar and said he was not taking medication.

Tejeda was arraigned in the robbery case in October 2012 and requested counsel in November. At a *Marsden* hearing the following January, Tejeda stated he wanted defense counsel to ask witnesses about the "Truman essence security project" that had

4

controlled his mind since birth. The court suspended proceedings the next day under Penal Code section 1368, declaring a doubt as to Tejeda's competence.[1] In March, while proceedings remained suspended, Tejeda filed a motion seeking discovery regarding the ongoing "government National Security Mind Control project" directing his actions.

In June 2013, the District Attorney charged Tejeda with the 2010 murder (§ 187, subd. (a), count 1) and the 2009 robbery (§ 211, count 2) in case No. FSB1302508 (the murder case). Soon after, the court declared a doubt as to Tejeda's competence and suspended proceedings.

A jury trial was held in June 2014 to determine whether Tejeda was competent to stand trial in both the robbery and murder cases. Dr. Marjorie Graham-Howard testified for the defense that Tejeda had been diagnosed with bipolar disorder and schizophrenia with major depression and exhibited symptoms of paranoia. She believed Tejeda's delusion regarding the mind control project affected his ability to rationally consult with his attorney. Rather than malinger, or pretend to have a mental illness, Tejeda was "faking good"—i.e., hiding his delusions to be taken seriously. Evidently crediting this testimony over the prosecution's three experts, the jury found Tejeda incompetent to stand trial. Tejeda was ultimately committed to Patton State Hospital (Patton).

In December 2015, the court held a bench trial to evaluate whether Tejeda had been restored to competency. Consistent with her prior testimony, Dr. Graham-Howard testified for the defense that Tejeda remained incompetent. Although Tejeda understood

---

[1]    Further statutory references are to the Penal Code.

the nature of the criminal proceedings, his delusions affected his ability to rationally assist his attorney. He had improved in the sense that he believed his attorney had his best interests at heart, but there was no change on the critical issue of his delusion. Testifying for the prosecution, Dr. Anicia Policar believed Tejeda had made significant progress with treatment. His behavior improved with antipsychotic medications, and he interacted well with staff, which would not be possible if he were delusional. Ultimately, the court found Graham-Howard's testimony "compelling and convincing" and concluded Tejeda was still incompetent to stand trial.

In June 2016, while proceedings remained suspended, the district attorney filed a grand jury indictment to consolidate the robbery and murder cases. The three-count indictment charged Tejeda with the 2010 murder (§ 187, subd. (a), count 1) and 2012 robbery involving two victims (§ 211, counts 2 & 3). A firearm use enhancement attached to count 1 (§ 12022.53, subds. (b)–(d)), and a deadly weapon enhancement attached to counts 2 and 3 (§ 12022, subd. (b)(1)). The indictment further alleged a prior strike (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and four prior prison terms (§ 667.5, subd. (b)).

In September 2016, the court held another hearing on competency. Dr. Roger Cabansag, staff psychiatrist at Patton, was the sole witness. During his treatment, Tejeda discussed "past" beliefs about a mind control project but stated these were not relevant to his legal case. Tejeda did not think these thoughts often and was not worried they would return. Although Tejeda had access to stamps, envelopes, and writing materials during his time at Patton, he at no point took a stack of envelopes to mail various people. His

6

conversations were logical, and in Cabansag's view, he would be able to assist counsel with his defense. Crediting Cabansag's testimony and report, the court found Tejeda had been restored to competency and reinstated proceedings. It determined Tejeda could set aside his delusions for purposes of assisting his counsel. If, as defense counsel suggested, Tejeda at some point sought to sabotage his criminal case to expose a government project, his competency could be reevaluated.

A jury trial commenced in July 2017. The People examined officers from the San Bernardino Police Department and the Best Market staff. Tejeda's videotaped confession to the detective played a central role in the prosecution's case. The defense theory was that Tejeda was *not* the perpetrator and had falsely confessed out of a desire to expose a delusional government program.

Several days into the prosecution's case-in-chief, Tejeda complained of dissatisfaction with appointed counsel, and the trial court cleared the courtroom for a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, 123−124 (*Marsden*). At that hearing, Tejeda expressed concern about his counsel's failure to plead not guilty by reason of insanity (NGI). The trial court made inquiries of Tejeda and his counsel before denying the *Marsden* motion.[2]

Later that day, against counsel's advice, Tejeda elected to testify in his defense. He admitted murdering the convenience store owner in 2010 during a robbery attempt and robbing clerks of that same store in 2009 and 2012. Although his body took certain

---

2      The details of the July 2017 *Marsden* hearing are discussed later in this opinion.

actions, he had been controlled by the project. With the money he stole, he thought he might buy some cigarettes and catch a plane to Langley to "get to the bottom of this mind control project." Tejeda unequivocally denied having a mental illness, claiming he previously lied about being schizophrenic and bipolar to qualify for disability benefits.

Both sides rested. Outside the jury's presence, defense counsel stated it remained the defense position that Tejeda lacked competency; Tejeda's testimony only underscored that view. The court implied the issue had been addressed at the *Marsden* hearing earlier that day before moving on to other topics.

The jury convicted Tejeda as charged and found the murder was in the first degree. A letter from Tejeda to the trial court requesting postconviction *Marsden* relief based on ineffective assistance of counsel was never addressed. Thereafter, a court trial was held on the prior conviction allegations, which were all found true. At sentencing in October 2017, the trial court imposed a determinate term of 18 years and an indeterminate term of 75 years to life in state prison.

DISCUSSION

Tejeda argues the trial court committed reversible error when it did not declare a doubt as to his competency to stand trial after it learned of his anticipated testimony at a midtrial *Marsden* hearing and then heard his actual testimony later that day. He contends his counsel's statements to the trial court and his own ensuing testimony revealed a present set of circumstances that was inconsistent with the express basis for the trial court's earlier finding that his competence to stand trial had been restored.

8

The Supreme Court's recent decision in *Rodas*, *supra*, 6 Cal.5th 219 guides our analysis. *Rodas* explains that when a defendant is initially found incompetent to stand trial but is later determined to have regained competence, the assumptions that effectively condition that determination provide a yardstick to measure later proceedings. If in the course of those proceedings the trial court learns of new facts and circumstances inconsistent with the predicate assumptions, it has a duty to declare a doubt regarding the defendant's current competence and conduct a hearing on the subject. Here, because the trial court did not do so, Tejeda is entitled to a new trial.

1.     *The* Marsden *Hearing on July 17, 2017*

The prosecution examined its first trial witness on Monday, July 10, 2017. Witnesses testified through Thursday; the court was not in session on Friday; and the prosecution resumed with its case-in-chief on Monday, July 17. Before jurors arrived that morning, Tejeda passed a note to the district attorney requesting a *Marsden* hearing. The trial court cleared the courtroom and made inquiries of Tejeda and his counsel.

Tejeda expressed concerns about his counsel's failure to plead NGI.[3] The trial court let Tejeda's attorney, Brian Foltz, respond. Foltz explained that when he took over the case in January 2017, he believed the best strategy would be to show that Tejeda could not have been the shooter. Tejeda seemed on board at the time. When they met on May 8, he expressly told Foltz he was "not at all interested" in an NGI plea.

---

[3]     He also raised concerns regarding discovery materials, which are not relevant to his claims on appeal.

9

Foltz mentioned that in the six months since taking the case, he had not been concerned about Tejeda's delusional thoughts. At times, Tejeda alluded to the fact that he still believed he was the subject of a government mind control program, but he would also state that he did not think those beliefs mattered for the case. Based on their communications, Foltz had not raised doubts as to Tejeda's competency where he otherwise might have. But Foltz suggested he was having second thoughts regarding Tejeda's competency after their last meeting on Friday, July 14, three days before the midtrial *Marsden* hearing. During that meeting, Tejeda told Foltz he never thought his case would get this far because he assumed President Donald Trump would intervene. He added that he wanted to testify and confess that his actions were the result of the mind control program.

The trial court denied the *Marsden* motion. It did not find the attorney-client relationship so broken that Tejeda would not receive adequate representation. The court noted that the prosecution was probably hours away from resting its case-in-chief, and defense counsel appeared to be pursuing a reasonable strategy. Although the court could not tell Tejeda what to do, it suggested that he cooperate with Foltz and continue with his defense strategy.

2. *Once the Express Basis for the Prior Competence Finding Was Undermined, the Trial Court Should Have Declared a Doubt as to Tejeda's Competence.*

"Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent." (*People v. Rogers* (2006) 39 Cal.4th

10

826, 846 (*Rogers*), citing *Drope v. Missouri* (1975) 420 U.S. 162, 181 (*Drope*) and § 1367.) Competency involves a two-pronged test. Courts evaluate whether a defendant understands the proceedings against him and whether he is presently able to consult with his lawyer with a reasonable degree of rational understanding. (*Rogers*, at pp. 846−847, citing *Dusky v. United States* (1960) 362 U.S. 402, 402 (*Dusky*).) Section 1367 codifies the test: a person is incompetent to stand trial "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

A trial court must suspend proceedings and conduct a competency hearing whenever it is presented with substantial evidence of incompetence—i.e., "evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." (*Rogers*, *supra*, 39 Cal.4th at p. 847, citing *Drope*, *supra*, 420 U.S. at p. 181 and § 1368.) When such doubt exists, the court appoints one or more experts to examine the defendant and holds a trial on the competency issue pursuant to section 1369. (*Rodas*, *supra*, 6 Cal.5th at p. 231.) Except under circumstances not relevant here, all criminal proceedings are suspended pending resolution of the competency issue. (§ 1368, subd. (c).)

A trial court's duty to conduct a competency hearing may arise at any time before entry of judgment. (*Rogers*, *supra*, 39 Cal.4th at p. 847.) However, after a defendant is found competent, the court need not conduct a second competency hearing unless presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of the earlier finding. (*Rodas*, *supra*, 6 Cal.5th at p. 231.)

11

"A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*Rogers*, *supra*, 39 Cal.4th at p. 847.) Even so, the failure to declare a doubt and conduct a hearing where there is substantial evidence of incompetence may result in reversible error. (*Ibid.*; *Rodas*, *supra*, 6 Cal.5th at pp. 239−241.)

In this case, Tejeda was twice found incompetent based on his delusions regarding the government mind control project. In both proceedings, Dr. Graham-Howard explained that Tejeda's delusions affected his ability to rationally assist defense counsel. Whereas some criminal defendants malingered, Tejeda was "faking good," suppressing his delusions so as *not* to be viewed as mentally ill. When the court ultimately found Tejeda competent, it did so on the premise that he understood his delusion was not relevant to his defense.

At the midtrial *Marsden* hearing, that premise was called into serious question. Defense counsel Foltz explained that Tejeda recently told him he "never thought [his case] would get this far, because he thought Donald Trump would intervene." Foltz went on to state that Tejeda "wants to testify and confess and speak about why he did it as a result of a mind control program." Had Tejeda expressed such views earlier, Foltz suggested he would have raised competency concerns.[4]

---

[4] The People's argument that Tejeda was being "manipulative" by not mentioning the mind control project until after the trial court rejected his alleged attempt to plead NGI is unsupported by the record. Defense counsel's statements about Tejeda's delusional remarks and intention to testify were made before the court issued its ruling on the *Marsden* motion.

Later that day, Tejeda took the stand against his counsel's advice. Foltz began with an open-ended question, "What was the main thing you want to testify about today?" Tejeda responded: "Mostly about being controlled by the government." On the stand, Tejeda explained that although his finger pulled the trigger, the government made him do it. He agreed he "wanted real bad to testify and let the jury know about the mind control program," and that it "wasn't [counsel's] idea" to do so.

After both sides rested, Foltz stated for the record that he learned of his client's delusions only recently (the Friday before Tejeda's Monday testimony). Because he did not represent Tejeda during competency hearings, he was not in a position to speak about whether circumstances had changed since he had been found competent. But it remained the defense position that Tejeda lacked competence to stand trial based on his inability to work with counsel, and his testimony only underscored that view. The trial court commented that there had been a lengthy *Marsden* hearing earlier that day on this issue and turned to address other matters.

On appeal, Tejeda argues that the trial court was required to declare doubt as to his competence when it learned he could not compartmentalize his delusion and separate it from his defense, where that was the basis for the earlier competency finding. The People respond that Tejeda's decision to testify about the mind control project against his attorney's advice "did not equate to a substantial change in circumstances triggering the need for a new competency hearing." Tejeda has the better argument. "Whether there has been a change in circumstances sufficient to call for a new competency hearing is necessarily a fact-specific inquiry. Under the facts of this case, however, it is plain that

13

the standard was met; the evidence before the trial court made it unreasonable to continue to rely on the prior competence finding in allowing the trial to proceed." (*Rodas*, *supra*, 6 Cal.5th at p. 235.)

Justice Kruger's recent opinion in *Rodas*, *supra*, 6 Cal.5th 219 is dispositive.[5] Diagnosed schizophrenic Domingo Rodas was found incompetent to stand trial and committed to a state hospital. (*Id.* at pp. 223–224.) After months of treatment, physicians certified him as competent provided he continued taking his medication. (*Id.* at pp. 225−226.) By the start of trial, the trial court learned he had stopped taking his medication and was again communicating incoherently with counsel about defense strategy. Defense counsel declared a doubt as to Rodas's competence. (*Id.* at p. 227.) The court held a brief colloquy, during which Rodas was able to identify the charges against him and expressed a willingness to work with his counsel. (*Id.* at pp. 228−229.) On this basis, the court allowed trial to proceed. Rodas then testified incoherently, against counsel's advice, and the trial court struck much of his testimony as irrelevant. (*Id.* at p. 229.) The jury convicted Rodas of multiple murders, and he received several life terms. (*Id.* at p. 230.)

The Supreme Court reversed, finding the trial court had a duty to declare a doubt as to Rodas's competency. The earlier competency finding was predicated on Rodas's continued intake of antipsychotic medication, and the court learned that he had not only stopped taking the medication but also was communicating incoherently with counsel.

---

5     Because *Rodas* was decided after briefing in this appeal was complete, we advised the parties to address the case during oral argument.

(*Rodas*, *supra*, 6 Cal.5th at p. 235.)  This new reality was confirmed and reinforced when Rodas took the stand.  (*Id.* at p. 240 ["defendant's testimony at trial only served to reinforce counsel's showing that his mental condition made it impossible for him to rationally assist in his defense"].)  Even if the evidence was conflicting, there was a substantial change in circumstances warranting a new competency hearing.  (*Id.* at pp. 234−235.)

As in *Rodas*, when the trial court was confronted with circumstances that were inconsistent with assumptions on which Tejeda's competency finding was based, the court had a duty to declare a doubt as to his competency.  Tejeda's restoration to competency was expressly premised on Dr. Cabansag's belief that he could compartmentalize his delusion and keep it separate from his legal defense.  Indeed, in making the competency finding the trial court recognized the possibility that at "some unspecified time in the future" Tejeda might attempt to "sabotage his own criminal case." Impliedly acknowledging that "[i]f that were to happen" it would be a significant change of circumstances, the court stated, "we can address it at that time."  Yet when "that time" came during the midtrial *Marsden* hearing, and certainly after Tejeda testified later that day, the trial court *did not* address the strong suggestion that as a result of his recurring delusions, Tejeda could no longer cooperate with his counsel and meaningfully assist in his defense.  Instead, it sidestepped the competency issue at the *Marsden* hearing and later referred back to that inconclusive hearing to imply the issue had already been

15

addressed.  On these facts, just as in *Rodas*, the trial court was required to declare a doubt as to Tejeda's competency and hold a new competency hearing.[6]

3.      *The Error Was Prejudicial, and Tejeda Is Entitled to a New Trial.*

Finding the trial court erred, we turn to prejudice.  There might be circumstances in which a trial court's failure to hold a competency hearing could be remedied by a retrospective hearing on the defendant's competence.  (*Rodas*, *supra*, 6 Cal.5th at p. 239.) The key question in determining whether retrospective relief is feasible is whether there is sufficient evidence in the record to reliably determine the defendant's mental competence *at the time of his earlier trial*.  (*Ibid.*)  In "unusual circumstances" the record may include "reliable evidence of the defendant's mental condition" at that earlier point in time.  (*Id.* at p. 241.)  But where, as is typically the case, the defendant exhibits fluctuating symptoms, significant time has passed, or there is a lack of contemporaneous expert evaluations, reliable retrospective evaluation is simply not feasible.  (*Id.* at pp. 240−241.)

Tejeda's symptoms either fluctuated or were carefully suppressed—defense counsel was unaware that his delusion impaired his ability to assist counsel until midway through trial.  The most recent psychiatric evaluation was in August 2016; there was no

---

6      Because we find the trial court erred, we need not address Tejeda's claim that defense counsel was ineffective.  Nevertheless, counsel certainly could have done more to bring the competency issue to the court's attention.  For example, he could have explicitly raised a doubt as to Tejeda's competence at the July 17 *Marsden* hearing when he described Tejeda's proposed testimony.  Alternatively, after Tejeda testified counsel could have specifically noted that the testimony undermined the predicate for his earlier competency finding.

16

reevaluation in July 2017 when the competency issue reemerged. Here, as in *Rodas*, the court's error in failing to hold a hearing as to Tejeda's competency was prejudicial and requires reversal for a new trial. (*Rodas*, *supra*, 6 Cal.5th at p. 241; *People v. Easter* (2019) 34 Cal.App.5th 226, 249 [reversal required where defense raised doubt as to competency 13 months after expert evaluations were performed].)[7]

4.      *Remaining Issues*

Tejeda raises four additional arguments on appeal. First, he argues the trial court prejudicially erred when it did not allow him to plead NGI during the midtrial *Marsden* hearing. Next, he contends the trial court erred by not holding a hearing on his postconviction *Marsden* motion. He also seeks remand to assess his entitlement to a new mental health diversion program (§ 1001.36). Finally, he argues we should remand for resentencing to permit the trial court to exercise its discretion whether to strike the firearm enhancement finding. (Sen. Bill No. 620, Stats. 2017, ch. 682, § 2.) Because we conclude that Tejeda is entitled to a new trial, we do not reach any of these contentions.

---

[7]      The People argue that Tejeda's conduct at trial "belied his asserted incompetence," noting he appeared rational and coherent, understanding the discovery and trial process. But during earlier competency proceedings, it was stipulated that Tejeda understood the nature of the criminal proceedings. His competency always hinged on the remaining prong—i.e., whether he could rationally assist counsel in the conduct of his defense. (§ 1367; *Dusky*, *supra*, 362 U.S. at p. 402.)

## DISPOSITION

The judgment is reversed and the matter is remanded to the superior court with directions to conduct a new competency hearing. Tejeda may be retried if he is not presently incompetent to stand trial.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

GUERRERO, J.

18