Filed 10/25/24  P. v. Dean CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081767 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF1500705) |
| DAVID ANTHONY DEAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jeffrey J. Prevost, Judge.  Reversed and remanded with directions.

Christopher Love, under appointment by the Court of Appeal,  for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Nora S. Weyl, Deputy Attorneys General for Plaintiff and Respondent.

In 2015, David Anthony Dean broke into his parents' home and assaulted his father and half-brother with a metal rod. Dean was charged with one count of burglary and two counts of assault with a deadly weapon. Dean pleaded not guilty by reason of insanity (NGI) and, after the guilt phase of his trial, the jury found him guilty of all three counts. In the second phase of trial, the jury rejected Dean's insanity defense. The trial court, however, granted Dean a new sanity trial after finding the jury failed to give proper weight to the testimony of two court-appointed psychologists who opined Dean was not sane when he committed the crimes.

The district attorney who prosecuted the case then unsuccessfully appealed the trial court's ruling. This court found the trial court's decision was supported by ample evidence and conditionally affirmed the new trial order, directing the trial court to consider whether Dean was eligible for mental health diversion in light of recently enacted legislation providing for such relief. Shortly after remand, Dean was found incompetent to stand trial and committed to the Department of State Hospitals (DSH) for a period of around three months. After his competency was restored, Dean filed a motion to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), which the court granted. Dean then continued a campaign, which he began after this court's prior remand, of ex parte court filings asserting he had been wrongly convicted and that he was the victim of a wide-ranging conspiracy. Seven months later, unsurprisingly, the court declared a doubt as to Dean's competency and he was committed to the DSH a second time.

Three months after Dean was found to have regained his competency, on January 6, 2022, he again successfully moved under *Faretta* to represent himself. Thereafter, Dean withdrew his NGI plea. After mental health

diversion was denied, Dean continued to argue he was wrongly convicted. Dean's filings and appearances before the court during the year-long period after his *Faretta* motion was granted clearly evidenced his competency remained in question, but no doubt was declared. In January 2023, the trial court sentenced Dean to 19 years in state prison.

On appeal from the judgment of conviction, Dean argues the court erred by granting his *Faretta* motions because he was not competent to represent himself at the time they were granted. The Attorney General concedes that Dean's final *Faretta* motion was improperly granted and asserts the proper remedy is a conditional reversal for the trial court to consider the feasibility of holding a retrospective competency hearing. We agree with the parties that reversal of the judgment is appropriate but conclude that a retrospective competency hearing is not feasible. Accordingly, the judgment is reversed and, if Dean is presently competent to stand trial, the court is directed to consider Dean's eligibility for mental health diversion and then, if necessary, proceed to the sanity phase of trial.

We also address the critical problem of Dean's insistence on self-representation because of his belief that his guilt remains at issue. Dean has twice regained his competency, then been granted a waiver of his right to counsel while "competent," and then decompensated once he was no longer under the supervision of the DSH. We have serious concerns that this pattern will again repeat if Dean is permitted to waive his right to counsel

and delay the remaining proceedings.[1]  Thus, we strongly advise the trial court to adjudicate Dean's case as quickly as possible and to be exceedingly circumspect in allowing Dean to exercise his rights under *Faretta* without any mechanism to ensure his mental health remains stable thereafter.

FACTUAL AND PROCEDURAL BACKGROUND

A

In 2015, Dean's father, stepmother, and their son, D.D., lived together in a house in Murrieta.  On April 14, 2015, around 11 p.m., D.D. was awakened by a loud crash and Dean slamming open his upstairs bedroom door.  Dean walked into the room swinging a three-foot metal pipe.  The brothers engaged in a scuffle, and Dean left the room and walked a few stairs down.  D.D. grabbed a gun from his room.  Dean's father and stepmother heard the commotion and came out of their adjacent bedroom.  They saw Dean on the stairs and Dean swung the metal pipe at his father.  Dean's father raised his arm to block the blow and the pipe struck his arm.  Dean's father fell down the stairs and could not walk.  His face and arm were bleeding.  Dean's stepmother called 911.

D.D. came out of his room with his gun, saw Dean lying on his back on the stair's landing area, and pointed the gun at him.  Dean had a broken leg and could not walk.  Dean crawled down the stairs repeatedly yelling "I'm King David, motherfucker.  I'm King David.  Shoot me.  Shoot me." Dean made it to the downstairs living room while D.D. kept his gun trained on him.

---

[1]     Although nothing we have discovered in the record directly states so, the record suggests Dean's mental health decompensates once he returns to jail and is no longer in the DSH's care (and perhaps not taking antipsychotic medication).  For this reason, if after remand a doubt is declared as to Dean's competency, the evaluating experts should specifically opine on whether Dean can remain competent while not in the care of the DSH.

Dean threw the pipe towards D.D., then hobbled into the kitchen and grabbed a knife.

Police soon arrived at the house and found Dean lying on a couch holding a knife to his throat. Dean was bleeding from his neck, refused to put the knife down, and threatened to kill himself and the police officers. The police attempted to negotiate with Dean, but he rambled incoherently and repeatedly referred to himself as "the King." Police eventually subdued Dean by shooting him with a beanbag shotgun and turning a police dog on him. Dean was taken into custody. After Dean's arrest, a handwritten note with blood on it was found in the family's kitchen. The letter contained delusions and incomprehensible statements.

B

Dean was charged by information with two counts of assault with a deadly weapon other than a firearm (a metal pipe) (counts 1 & 2; Pen. Code, § 245, subd. (a)(1)[2]) and burglary of an inhabited dwelling house (count 3; § 459). As to count 3, the information alleged that another person other than an accomplice was present at the time of the offense (§ 667.5, subd. (c)(21)). The information also contained three allegations that Dean had previously served time in prison pursuant to section 667.5, subdivision (a), an allegation he had a serious prior conviction pursuant to section 667, subdivision (a), and an allegation that he had a serious violent offense conviction within the meaning of sections 667, subdivisions (c) and (e)(1) and 1170.12, subdivision (c)(1). Dean pleaded not guilty and not guilty by reason of insanity. As a result of his NGI plea, the court appointed two psychiatrists to evaluate Dean under section 1026.

---

[2]   Subsequent undesignated statutory references are to the Penal Code.

5

On July 31, 2017, after the guilt phase trial, a jury found Dean guilty on all counts and found true the allegation that the house was occupied at the time of the burglary. The case then proceeded to the sanity phase trial. During this phase, Dean's trial counsel presented evidence of the handwritten note found shortly after Dean was arrested. The note was discovered on the kitchen floor where Dean had been the night of the crimes. "There was blood and fluid around the kitchen and the note was wet with blood. The note referred to Dean as a prince and to a dinosaur. The note was fragmented and did not make sense." (*People v. Dean* (Nov. 29, 2018, D074700) [nonpub. opn.] (*Dean*).)

The two appointed psychologists, Dr. Robert Suiter and Dr. William Jones, testified about their evaluations of Dean. "Dr. Suiter evaluated Dean and reviewed historical mental health record, police reports, a letter from a family member, and handwritten documents from Dean." (*Dean, supra*, D074700.) Dr. Suiter opined that "Dean had a history of psychosexual delusions, which are fixed beliefs not based in reality. He believed his [father] had sexually molested family members, who then engaged in molestation of others as adults. He also believed family members were suffering from Stockholm Syndrome." (*Ibid.*) Dr. Suiter testified that "Dean also had a history of auditory hallucinations, believing voices talked to him from the television." (*Ibid.*) Dr. Suiter stated that Dean told him "he believed [his father] had been molesting individuals, including a child" and that "Dean went to the house on the night of the incident to confront [his] father." (*Ibid.*)

"Dr. Suiter opined Dean had schizoaffective disorder and was not sane at the time of the crimes. He based his opinion on Dean's history of chronic mental disorder along with symptoms at the time of the crime, which were

6

corroborated by police reports of the arresting officers." (*Dean, supra*, D074700.) Dr. Suiter believed that due to Dean's "severe mental disorder," he "was experiencing an elaborate delusional system and was unable to appreciate his beliefs were not based in reality. His confrontation of [his father] based on the delusions led Dr. Suiter to conclude Dean was unable to appreciate the wrongfulness of his actions at the time." (*Ibid.*)

Dr. Jones testified that Dean told him that he thought his father and half-brother "were molesting children or were about to molest children in the family," that he "heard the voice of a Las Vegas casino owner", and that "his cousin was communicating with him telepathically and they had a suicide pact." (*Dean, supra*, D074700.) Dean also told Dr. Jones that a "year or two before the incident, [he] believed everyone in the world could hear or be aware of his thoughts." (*Ibid.*) Dean "said he went to the home on the night of the incident because he was trying to prevent a child from being molested," that his half-brother "had Stockholm Syndrome," and that he "believed the police were 'in on it.' " (*Ibid.*)

At trial, "Dr. Jones opined Dean had bipolar mood disorder, type I, with psychotic features. In his opinion, Dean suffered from this mental illness at the time of the incident. Dr. Jones saw no evidence to indicate malingering. Dr. Jones considered Dean's behavior leading up to the crime. Dr. Jones opined Dean was legally insane at the time he committed the crimes. Dean was not capable of knowing or understanding the nature of his acts or distinguishing right from wrong." (*Dean, supra*, D074700.) Dr. Jones also testified that Dean's act of stabbing "himself in the neck twice appeared to be a significant suicidal effort, which is not consistent with malingering." (*Ibid.*)

Following the sanity phase evidence, on August 8, 2017, the jury found Dean sane as to counts 2 and 3. The jury hung as to count 1 and the trial

7

court declared a mistrial on that count. Count 1 was subsequently dismissed in the interest of justice. Dean admitted his prior conviction was a strike prior.

On October 13, 2017, the trial court granted Dean's motion for a new sanity phase trial. The People appealed the trial court's ruling. This court conditionally affirmed the trial court's ruling and remanded the case for a new sanity phase trial. (*Dean, supra*, D074700.) Based on recent changes to the law at that time, we directed the trial court to first consider whether Dean was eligible for mental health diversion under section 1001.36. If diversion was granted and successfully completed, we directed the trial court to dismiss the charges under the statute. If the trial court determined Dean was ineligible for diversion, or he did not successfully complete diversion, we directed the court to conduct a new trial on the issue of sanity. (*Ibid.*)

C

After remand, on December 21, 2018, Dean filed a motion under *Faretta* to represent himself in the remaining proceedings. The court granted the petition.

On January 30, 2019, the court scheduled a mental health diversion hearing in accordance with our directions on remand. At the hearing on February 14, 2019, Dean requested that the trial court appoint counsel to represent him. The court granted the request, appointed counsel for Dean and continued the mental health diversion hearing to March 5, 2019.

At the hearing, Dean's newly appointed counsel declared a doubt as to his competency under section 1368 and the court vacated the diversion proceedings. The trial court then suspended criminal proceedings and appointed a psychiatrist and a psychologist to prepare competency reports. The reports were submitted to the court and both professionals opined that

8

Dean was not competent to stand trial. On April 26, 2019, based on the mental health expert reports and the court's own observations of Dean's behavior, the trial court found Dean mentally incompetent to stand trial and ordered him committed to the custody of the DSH.

On July 12, 2019, the DSH filed a certificate of mental competency in accordance with section 1372. The certificate was based on the report of a forensic psychologist, who opined Dean was able to understand the nature of the criminal proceedings and rationally assist his public defender in his defense. On August 9, 2019, the trial court found Dean's mental competency restored and reinstituted criminal proceedings.

A few months later, during a hearing on November 21, 2019, Dean made his second *Faretta* motion. Dean told the court he intended to seek to dismiss his case, repeatedly asserting the guilt phase trial was "invalid" and that the prosecutor had no "valid case body."

After thoroughly explaining to Dean the risks of self-representation, the trial court granted Dean's motion and set a trial date for the sanity phase of February 3, 2020. Thereafter, the court continued the trial several times at Dean's request and as a result of the Covid-19 pandemic. At each hearing during this period, Dean displayed signs of irrational thinking and confusion, repeatedly telling the court he was the victim of a conspiracy against him and threatening individuals involved in the proceedings. Dean also submitted hundreds of pages of documents to the court riddled with indecipherable statements, and attaching various court filings from the present case and other cases.

At a continued trial readiness conference on June 19, 2020 the trial court again declared a doubt as to Dean's competency to stand trial. Dean was removed from the court for disruptive behavior. Thereafter, Dean's prior

defense counsel, who was present, asked the court to continue the matter in order to meet with Dean. At the continued hearing on June 24, 2020, Dean was again removed from the courtroom for his disruptive behavior, including making threats to kill, and the court suspended the criminal proceedings in accordance with section 1368 and referred Dean for competency evaluations.

On August 6, 2020, after receiving the results of the two competency evaluations (as well as hundreds of pages of additional documentary submissions from Dean), the court found Dean incompetent to stand trial and again committed him to the DHS. In addition, the court ordered a psychological evaluation to determine whether Dean met the criteria to be involuntarily administered antipsychotic medication under section 1370.[3] Both psychologists who evaluated Dean opined he was not competent to stand trial or assist counsel. One indicated in his report that Dean was suffering from paranoid schizophrenia and that he was "verbalizing delusional ideations of the grandiose and paranoid nature." The psychologist noted that his evaluation was largely impeded because Dean was focused only on arguing he had been wrongly arrested and convicted.

On August 13, 2021, the trial court found that Dean's mental competency was restored based on a certificate of mental competency prepared on July 29, 2021. The certification report noted that Dean had been admitted to the state hospital on May 12, 2021 and that he had been compliant with treatment and taking antipsychotic medication. The psychologist who evaluated Dean concluded he sufficiently understood the legal proceedings he was facing, and that although he continued to argue he had been wrongly convicted and was the victim of a conspiracy, that his

---

[3] The psychologist who evaluated Dean for this purpose found he met the criteria to support a court order for the involuntary administration of antipsychotic medication.

10

thinking had become "more flexible" and he was willing to admit his understanding of the law was limited and that he should consider the advice of counsel.

After Dean's competency was again restored, he continued to barrage the trial court with correspondence. In September 2021, Dean made a motion under *People v. Marsden* (1970) 2 Cal.3d 118, to replace his counsel. The record does not contain any indication concerning the resolution of Dean's motion. At a hearing on January 6, 2022, the trial court stated it had received paperwork indicating Dean wanted to act as his own lawyer.[4] After asking Dean if he understood the general risks associated with self-representation, the court granted Dean's *Faretta* motion. The court made no inquiry concerning Dean's competence. Thereafter, Dean continued to regularly submit ex parte documentation to the court asserting he had been wrongly convicted.

At a hearing on February 4, 2022, before a different judge, the district attorney explained Dean continued to insist he was wrongly convicted and his case should be dismissed. The court stated it was in possession of a lengthy "common law motion to dismiss" filed by Dean that had not been properly served on the prosecution. Because it was not properly served, the court continued the hearing for 30 days and also denied Dean's request for additional hours for his appointed investigator.

At a subsequent hearing on April 4, 2022, this time before the judge who presided over Dean's trial (Hon. Jeffrey J. Prevost), Dean argued his motion to dismiss on various grounds. In essence, he contended the jury's verdict had been based on wrongdoing by the prosecutors and witnesses. The prosecutor responded that Dean's motion was improper, and that he had not

---

4    The judge at this hearing had never presided over Dean's case before.

11

presented any basis for the court to reconsider the jury's verdict after the guilt phase of trial. The court denied Dean's motion.

Then, on June 6, 2022, at a trial readiness conference, before Judge Prevost, Dean argued his case should be dismissed "due to lack of speedy trial violation." He also stated if his motion to dismiss were again denied, he intended to seek diversion, and if that was denied, he would "pull [his] plea under People versus Kelly and have the court sentence [him] on no valid conviction." After the court denied Dean's motion to dismiss and some discussion concerning Dean's requests for various documents from the prosecutor, Dean withdrew his not guilty by reason of insanity plea, and asked the court to "go ahead and sentence me on the conviction that was fixed to convict me." Dean also asked the court to construe his motion to dismiss as an "amended *Romero*" and "find that not one valid conviction is actually valid through legal means."

When the court asked Dean if he understood that he had a right to trial on the issue of his sanity at the time of the crimes, Dean responded with a lack of understanding about the situation he was in. He told the court, "I'm not wanting to go to a sanity portion when the guilt phase was malfeasance, mischaracter of justice. ... It is obvious before the Court there was a malfeasance and pollution and corruption by the district attorney and trial defense to wrongfully convict me." The court then pressed Dean on his understanding of his rights, both to a trial and to be represented by counsel. Dean responded that he understood, but also stated he wanted "to bring to the court's attention that there is not one valid confession" and no "valid evidence" linking him to the crimes. The court granted Dean's request to withdraw his plea, and set a sentencing hearing for June 29, 2022.

12

At the sentencing hearing, Judge Prevost indicated he wanted to address the issue of mental health diversion pursuant to this court's directions on remand, which the court stated had "kind of escaped [the] attention" of the trial court and parties. Dean agreed with the court, and stated that he was seeking diversion. The prosecutor asserted that because Dean had made "no official application for mental health diversion," the issue was waived. The trial court found there was no waiver, ordered an evaluation for Dean under section 1001.36 to assess his eligibility for mental health diversion, and set a hearing for July 5, 2022.

The diversion hearing was then delayed by Dean's repeated requests for continuances. On July 22, 2022, and August 23, 2022, Dean filed letters with the court titled "Amendment to Reinstate 6-06-22 Plea of N.G.I.," in which he stated he would "replea" to not guilty by reason of insanity "to legally participate in diversion if court doesn't reverse/dismiss guilt phase illegal conviction with prejudice." On August 15, 2022, the prosecution filed an opposition to mental health diversion asserting Dean could not meet his burden to show his eligibility for diversion under section 1001.36. At a hearing the same day, the trial court again appointed a different doctor to examine Dean for mental health diversion and to furnish a report to the court.

On September 15, 2022, and September 26, 2022, Dean filed a "Motion to Withdraw Diversion." Therein, Dean stated he was withdrawing his request for diversion because the court refused to dismiss the convictions even though the guilt phase was "illegally fixed." He also stated his case should be "a dismissal or alternative a 100% illegal sentence." On the same dates, Dean filed *Romero* motions seeking to dismiss his prior strike convictions.

13

By the time of a court hearing on November 14, 2022, the court had yet to receive a report from the appointed psychologist on Dean's eligibility for mental health diversion. As a result, the court continued the hearing. The report was finally received on January 4, 2023. The report explained that Dean was currently suffering from mental illness, though the psychologist noted she was not provided with reliable details of Dean's mental health history or the specific circumstances of his crimes. She opined that Dean met four of the five criteria for mental health diversion under section 1001.36: he suffered from a designated mental health disorder; his disorder played a significant role in the commission of the charged offenses; his symptoms motivating the criminal behavior would respond to treatment; and he consented to complying with treatment as a condition of diversion. However, she concluded Dean did not satisfy the fifth criteria, whether Dean posed an unreasonable risk of danger to the public if treated in the community, because of his "level of irritability" and current symptoms. She opined Dean needed treatment in a "locked, supervised setting," and that he had admitted to engaging in violence on several occasions during his incarceration.

At a hearing two days later, the trial court denied Dean's request for mental health diversion. The court adopted the opinion of the evaluating psychologist, concluding Dean satisfied four of the five criteria for diversion, but that he was ineligible because he posed an unreasonable risk of danger if treated in the community. The court also denied Dean's *Romero* motion. At the conclusion of the hearing, the court set Dean's sentencing hearing for January 27, 2023.

At the sentencing hearing, Dean objected to proceeding with sentencing, repeating the arguments he made time and again that he was wrongly convicted and that his rights had been violated throughout the

14

proceedings. The court overruled Dean's objections. The court heard a victim impact statement from Dean's father, who told the court his son's mental health issues caused the crimes and that Dean never should have been prosecuted. The prosecutor recommended Dean be sentenced to 19 years in state prison. The trial court adopted the prosecutor's recommendation and sentenced Dean to 19 years in prison consisting of the upper term of six years for Dean's residential burglary conviction (count 3), doubled to twelve years because of Dean's prior strike, and one-third the midterm of three years for the assault conviction (count 2), doubled to two years for the deadly weapon enhancement, plus five years for Dean's serious prior felony enhancement. Finally, the court ordered the prior prison term enhancements stricken.

Dean timely appealed from the judgment of conviction.

## DISCUSSION

Dean asserts the trial court erred by permitting him to represent himself and that this error was prejudicial per se. The Attorney General agrees the court erred by allowing Dean to proceed in pro per when the court granted his third *Faretta* motion on January 6, 2022 and that substantial evidence of his mental instability should have triggered competency proceedings.

The parties, however, slightly disagree on the appropriate remedy this court should provide. Dean argues we can retroactively determine he was not competent to represent himself based on the appellate record. In the alternative, he argues the trial court should retrospectively assess his competency on remand. He also asserts that if the trial court conducts a retrospective assessment and concludes Dean was competent to represent himself, "the judgment may be affirmed." Confusingly, however, he also asserts that to preserve his right to a fair trial, he should not be permitted to

15

represent himself on remand because Dean has recently indicated in letters to this court that he believes no lawyer can adequately represent him and only he will be able to persuade the trial court he was wrongly convicted at the guilt phase of his trial.[5]

The Attorney General asserts the proper remedy is a "conditional reversal so the trial court can consider the feasibility of holding a retrospective competency trial." (*People v. Wycoff* (2021) 12 Cal.5th 58, 92.) The People assert that if it is feasible to place Dean " 'in a position comparable to the one he would have been placed in prior to the' " sanity trial, "then a retrospective competency hearing [could] occur with no due process violation." If a retrospective competency hearing is not feasible, or if Dean proves his incompetency at such a hearing, the Attorney General contends the matter should be reversed and the sanity phase retried. On the other hand, if Dean is found competent at a retrospective competency proceeding, the judgment should be reinstated.

We agree with the parties that the trial court erred by granting Dean's third *Faretta* motion. As for the remedy, as we shall explain, we conclude a retrospective competency hearing is not feasible. Therefore, we reverse the judgment of conviction and, if Dean is presently competent, direct the trial court to proceed to consider Dean's eligibility for mental health diversion under section 1001.36 and then, if necessary, to proceed to the sanity phase of trial.

---

[5]    Dean submitted several letters to this court seeking to terminate his appellate counsel and proceed in pro per. His appellate counsel filed a motion to augment the record with one such letter. The motion to augment is denied. (See *In re K.M.* (2015) 242 Cal.App.4th 450, 456 ["The augmentation procedure cannot be used to bring up matters occurring during the pendency of the appeal because those matters are outside the superior court record."].)

# I

## *Legal Standards*

"A defendant has a federal constitutional right to the assistance of counsel during all critical stages of a criminal prosecution." (*People v. Mickel* (2016) 2 Cal.5th 181, 205 (*Mickel*); see *Faretta, supra*, 422 U.S. at p. 807.) "A defendant may also waive this right and personally represent him- or herself, so long as the defendant's waiver of the right to counsel is valid." (*Mickel*, at p. 205.) "A valid waiver requires that the defendant possess the mental capacity to comprehend the nature and object of the proceedings against him or her, and that the defendant waive the right knowingly and voluntarily." (*Ibid.*) "If a defendant has validly waived the right to counsel, a trial court must grant a defendant's request for self-representation." (*Ibid.*)

The California Supreme Court recently reiterated the standard for waiving counsel: "A two-part inquiry determines whether a defendant may waive the right to counsel: (1) The defendant must be competent to stand trial, and (2) the trial court must 'satisfy itself' that the waiver of 'constitutional rights is knowing and voluntary.' " (*People v. Waldon* (2023) 14 Cal.5th 288, 307 (*Waldon*).)

"Section 1367 of the Penal Code, incorporating the applicable constitutional standard, specifies that a person is incompetent to stand trial 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*People v. Rodas* (2018) 6 Cal.5th 219, 230–231 (*Rodas*).) "When there is reason to doubt a defendant's mental capacity to waive counsel, the court's determination should be made after a careful inquiry into the defendant's competence,

17

including consideration of psychiatric evidence." (*Waldon, supra*, 14 Cal.5th at p. 307.)

Further, the United States " 'Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial ... but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.' ([*Indiana v.*] *Edwards* [(2008) 554 U.S. 164,] 177–178.) The [United States Supreme Court] call[s] those defendants competent to stand trial but not to represent themselves 'gray-area defendants.' " (*People v. Johnson* (2012) 53 Cal.4th 519, 527 (*Johnson*).) "[T]he standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id.* at p. 530.)

If the defendant is competent to represent himself or herself, "[n]o particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070.) Rather, a " 'defendant seeking to represent himself "should be made aware of the danger and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " ' " (*People v. Burgener* (2009) 46 Cal.4th 231, 240–241.) The test is whether " 'the record as a whole shows that the defendant understood the dangers of self-representation.' " (*Id.* at p. 241.)

18

In addition, the "defendant 'should at least be advised that: self-representation is almost always unwise and that the defense he conducts might be to his detriment; he will have to follow the same rules that govern attorneys; the prosecution will be represented by experienced, professional counsel who will have a significant advantage over him in terms of skill, training, education, experience, and ability; the court may terminate his right to represent himself if he engages in disruptive conduct; and he will lose the right to appeal his case on the grounds of ineffective assistance of counsel.' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 546 (*Sullivan*).) The defendant " 'should also be told he will receive no help or special treatment from the court and that he does not have a right to standby, advisory, or cocounsel.' " (*Ibid.*)

"The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence." (*Johnson, supra,* 53 Cal.4th at p. 531.) Whether a waiver is knowing and voluntary is reviewed de novo and requires an examination of the entire record. (*Mickel, supra*, 2 Cal.5th at p. 205.) The burden is on the defendant to demonstrate he did not knowingly and intelligently waive his right to counsel. (*Sullivan, supra*, 151 Cal.App.4th at p. 547.)

## II

### *Analysis*

As stated, the parties agree the trial court erred by failing to declare a doubt concerning Dean's competence before allowing him to represent himself at the third *Faretta* hearing, and so do we. As the Attorney General points out, Dean has a lengthy history of severe mental illness, a pattern of regaining competency and then again becoming incompetent, and there were significant signs that he was not competent at the time the trial court

19

permitted him to again represent himself on January 6, 2022, and thereafter. As stated, "[w]hen there is reason to doubt a defendant's mental capacity to waive counsel, the court's determination should be made after a careful inquiry into the defendant's competence, including consideration of psychiatric evidence." (*Waldon, supra*, 14 Cal.5th at p. 307.) No such inquiry was made here.

"If, after a competency hearing," as here, "the defendant is found competent to stand trial, a trial court may rely on that finding unless the court ' "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.' " (*Rodas, supra*, 6 Cal.5th at p. 231.) In this case, at the time of the third *Faretta* motion hearing, and in the months leading up to that hearing, Dean submitted hundreds of pages of documents to the court that cast doubt on his mental competence. Further, Dean's history of gaining competence and decompensating in the years after the guilt phase of trial, placed the trial court on notice that his competency was unstable. (See *id*. at p. 238 ["the evidence before the court went beyond a simple report that defendant was speaking or acting bizarrely; against the background of medical reports detailing defendant's history of schizophrenia and the importance of medication in controlling his symptoms, [defense] counsel's report raised a reasonable doubt as to defendant's continued competence"].) As the parties agree, the trial court erred by granting the *Faretta* motion without engaging Dean at all about his mental state.

The trial court judge who granted the motion, Honorable Jorge C. Hernandez, had not presided over Dean's case before that day. At the hearing, after Dean's counsel made his appearance on the record, the court stated it had received paperwork indicating Dean wanted to represent

himself. The trial court then asked Dean about his understanding of the risks associated with self-representation, and then specifically asked whether he understood no standby counsel would be provided, and that he would be expected to know the rules of court, how to make pretrial motions, pick a jury, make opening statements, cross-examine witnesses, subpoena and present witnesses, make objections, ask for jury instructions, and make a closing argument. To these two questions, Dean responded simply "Yes, sir." and "Yes. I do, sir."

The trial court then explained that Dean could not file correspondence ex parte and that although the court had seen a recent submission by Dean, he would not read it until the People were served. After informing Dean the court would appoint an investigator to assist him with filing of documents, the trial court granted his request to proceed in pro per and relieved his appointed counsel. Dean then asked the court for copies of some of his previous filings. The trial court responded, "I looked at the history of your case, I saw that you filed close to – maybe I'm exaggerating – it looked like 30, 40 different correspondence" and then stated the court would not make its clerk Dean's secretary.

Whether Judge Hernandez was aware of Dean's mental health history is unclear on this record. However, there was significant evidence before the court that should have prompted inquiry into Dean's competence to waive counsel. The judge's brief explanation and questioning of Dean's understanding of the right to counsel he was waiving entirely failed to address Dean's competence to waive that right, or to present a defense at his sanity trial. Given Dean's extensive documented history of mental impairment, this was clear error. (*Waldon, supra*, 14 Cal.5th at pp. 309–310, citing *Indiana v. Edwards* (2008) 554 U.S. 164, 176–177; *Johnson, supra*, 53

21

Cal.4th at p. 533.) At minimum, the record suggests that at the time the motion was granted Dean was "suffer[ing] from a severe mental illness to the point where he ... [could not] carry out the basic tasks needed to present [an insanity] defense without the help of counsel."[6] (*Johnson,* at p. 530.)

III

*Remedy*

As discussed, the parties provide slightly different variations on the proper disposition of the case. In *Rodas*, the California Supreme Court considered the appropriate remedy for the type of error here, "sometimes referred to as *Pate* [*v. Robinson* (1966) 383 U.S. 375, 385–386] error—that is, a court's due process error in failing to suspend criminal proceedings and determine the defendant's competence." (*Rodas, supra*, 6 Cal.5th at p. 238.) In *Rodas*, the trial court erred by failing to institute competency proceedings prior to trial even though defendant's counsel declared a doubt and the defendant exhibited clear symptoms of mental incompetence. (*Id.* at p. 223.) Like here, Rodas had been previously found incompetent in the same criminal proceeding. (*Ibid.*) Also like this case, the Attorney General argued in *Rodas* that the court should "order the case remanded to the trial court for a hearing to determine whether defendant was in fact competent at the time of his trial." (*Id.* at p. 238.)

---

[6] Dean also argues the court erred by granting his second *Faretta* motion on November 19, 2020. The Attorney General responds that because Dean had been recently found competent at that time, and the court gave a much more thorough *Faretta* warning, there was no error. Because we agree with the parties that Dean's third *Faretta* motion was improperly granted and reverse the judgment of conviction, we decline to reach this moot issue. (See *In re Arroyo* (2019) 37 Cal.App.5th 727, 732 [" ' "[a] case becomes moot when a court ruling can have no practical impact" ' "].)

22

Without deciding whether such a retrospective competency hearing was ever an appropriate remedy for *Pate* error, the high court concluded it was not available in the case before it because " 'the inherent difficulties of such a nunc pro tunc determination' [citation] [could] not be overcome under the circumstances of the case." (*Rodas, supra*, 6 Cal.5th at p. 239.) The court explained "the critical question in determining whether a retrospective competency hearing is feasible is whether there is 'sufficient evidence to *reliably* determine the defendant's mental competence when tried earlier.' [Citation.] The burden of proof in a retrospective hearing is on the defendant, and feasibility requires finding that such a hearing 'will provide defendant a *fair opportunity* to prove incompetence, not merely [that] some evidence exists by which the trier of fact might reach a decision on the subject.' " (*Rodas,* at pp. 239–240.)

Further, *Rodas* noted that "[s]everal factors might bear on this inquiry" but in the case before it, the "dominant considerations [were] the fluctuating nature of defendant's symptoms, the passage of time, and the lack of contemporaneous expert evaluations." (*Rodas, supra*, 6 Cal.5th at p. 240) The court held that "[t]o saddle defendant with the burden of proving his incompetence ... around five years after the fact, without the benefit of any contemporaneous psychiatric, psychological, or neurological evaluation, would neither be fair nor produce a reliable result." (*Id.* at p. 240.) "Had the trial court declared a doubt about competence [before trial], the court would have appointed two experts to examine defendant and report on aspects of his mental condition relevant to competence, as well as the appropriateness of medical treatment for any condition found. (Pen. Code, § 1369, subd. (a).) ... A retrospective hearing, in contrast, would presumably require an attempt by psychologists or psychiatrists to reconstruct defendant's mental condition at

23

trial based on the prior medical reports and defendant's behavior at the time of trial." (*Id*. at pp. 240–241.)

The *Rodas* court noted that the "most recent expert evaluation," from almost a year before the trial, "tied defendant's competence to continuation of his medication. Given the showing that by [trial the] defendant had long since stopped taking his medication and had suffered a significant relapse into a more florid psychotic condition, it is difficult to see how a psychologist or psychiatrist appointed to make a retrospective evaluation could reliably find defendant was nonetheless competent at the time of trial." (*Rodas, supra*, 6 Cal.5th at p. 241.) The court thus concluded, "[u]nder the particular circumstances of this case, at a distance of around five years and without any expert evaluations from the time of trial, we do not believe the trial court could fairly come to a reliable conclusion that defendant was competent at that time." (*Ibid.*)

Likewise here, given the passage of time and the lack of any contemporaneous evaluation of Dean's mental health at the time of the third *Faretta* hearing, conducting a retrospective competency hearing is simply not feasible. The most recent psychological competency examination conducted of Dean, which supported his restoration to competency in August 2021, was prepared on July 29, 2021, six months prior to the *Faretta* hearing.[7] Like the defendant in *Rodas*, that report showed that Dean's mental health was good at that time, but—especially in conjunction with Dean's long history of severe mental illness—suggests the stability was a result of forced antipsychotic medication while he was committed to the DSH. The record suggests that by the time of the *Faretta* hearing, Dean's mental state had decompensated

---

[7]    Dean was evaluated in late 2022 for purposes of mental health diversion, but the reviewing psychologist did not consider Dean's competency to stand trial or represent himself.

likely because he was no longer taking that medication. "Under the particular circumstances of this case, at a distance of [almost three and a half years after his most recent psychological competency evaluation] and without any expert evaluations from the time of [the *Faretta* hearing], we do not believe the trial court could fairly come to a reliable conclusion that defendant was competent at that time." (*Rodas, supra*, 6 Cal.5th at p. 241.) Accordingly, we conclude a retrospective competency "hearing would not supply an adequate remedy." (*Ibid.*) If on remand, the trial court declares a doubt as to Dean's competency, any expert appointed to evaluate Dean should specifically consider his competency to stand trial and to represent himself, and also whether Dean can maintain his competency while not in the care of the DSH.

## DISPOSITION

We reverse the judgment of conviction. On remand, if Dean is presently competent, the trial court is directed to consider Dean's eligibility for mental health diversion in accordance with section 1001.36 and, if necessary, proceed to the sanity phase of trial. If after remand a doubt is declared as to Dean's competency, any expert appointed to evaluate Dean should specifically consider his competency to stand trial and to represent himself, and also whether Dean can maintain his competency while not in the care of the DSH.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

DATO, J.

26